UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEBBIE DUGAR,<br>DELOIS GILLESPIE,<br><br>            Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>            Defendant. | Case No.: 1: 05 CV 01500<br>Judge Kennedy |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671–2680. On December 10-13, 2007, this Court conducted a bench trial to receive evidence regarding plaintiffs' claims for damages. Based on the evidence presented at the trial and the record of this case, the Court makes the following:

### I.   FINDINGS OF FACT

**A.   EVENTS OF AUGUST 2, 2002**

1. On August 2, 2002, plaintiffs were passengers on a bus that is owned and operated by the Washington Metropolitan Area Transit Authority, when the bus was struck by an

1

automobile owned by the U.S. Secret Service, an agency of the United States of America, ["defendant"]. (Joint Pre-Trial Statement, 1)

2. At the time of the accident, defendant's vehicle was being operated by Mr. Johnny Stinson, a Secret Service employee who was acting within the scope of his employment. (Joint Pre-Trial Statement, 1)

3. Defendant's vehicle was heading south on 11th Street, NW when Mr. Stinson abruptly changed lanes, striking the bus in which the two plaintiffs were traveling in the right hand lane. Defendant has conceded that Mr. Stinson was negligent and that it is liable. (Joint Pre-Trial Statement, 1)

B.  **PLAINTIFF GILLESPIE'S INJURIES AND DAMAGES**

4. Immediately prior to the accident, Ms. Delois Gillespie was reading a book, seated in the back part of the bus that faced toward the center aisle. (PX 1, 12/10/07; 6:4-5)[1]

5. At the time of the accident, Ms. Gillespie was unaware that an accident was about to occur. (12/10/07; 9:1-6).

6. As a result of the impact of defendant's vehicle hitting the bus, Ms. Gillespie was thrown into a pole adjacent to where she was seated, striking her right collar bone (clavicle) against the pole. (12/10/07; 7:25, 8:1-11) Ms. Gillespie testified that it "felt like something had cracked inside." (12/10/07; 9:1).

---

[1] PX 1 denotes Plaintiffs' Exhibit 1. Authors, page numbers, or dates of exhibits are included when applicable. References to the official trial transcript are to the day, page, and line. 12/10/07; 6:4-5 denotes December 10, 2007, page 6, at lines 4 through 5.

2

7. Ms. Gillespie was taken by ambulance to Washington Hospital Center, where she was diagnosed with a fractured right clavicle. (Plaintiff's Exhibit 7; Washington Hospital Center 8/2/02:2) A fractured clavicle is a painful injury that requires a significant amount of force in order for it to occur. (12/10/07; 131:1-15)

8. Ms. Gillespie was treated at the Washington Hospital Center's emergency room. After she was diagnosed with a fractured clavicle, she was prescribed 400mg of Motrin and a Percocet tablet and was put into a sling. (PX 7; Washington Hospital Center 8/2/02:1-3)

9. Four days later, Ms. Gillespie visited the private orthopedic surgery practice of Drs. Phillips, Green, Salter, and Meyer, where she would become a patient of Dr. Frederic L. Salter and then later, Dr. Richard Meyer. (PX 7; Dr. Salter's 8/6/02 Report: 1)

10. Dr. Salter, who testified as an expert witness for Ms. Gillespie at trial, is a board certified orthopedic surgeon who specializes in shoulder injuries and surgeries. He has received highly specialized training in shoulder anatomy and has treated thousands of patients suffering from injuries of the clavicle. (12/10/07; 123:12, 128:7-9, 130:25)

11. Between her initial visit in August 2002 and March 2003, Dr. Salter or his colleague, Dr. Meyer saw Ms. Gillespie at least once every four weeks. (See Plaintiff's Exhibit 7, which contains reports from Dr. Salter and Dr. Meyer from the following dates: 8/6/02; 8/13/02; 8/20/02; 9/10/02; 10/1/02; 10/18/02; 11/15/02; 12/13/02; 1/3/03; 2/4/03; 3/4/03). During this period, both doctors noted that Ms. Gillespie continued to experience pain from her right shoulder and clavicle region.

12. Due to Ms. Gillespie's continuing pain and apparently delayed healing, on March 4, 2003, a CT Scan was ordered. (PX 7; Dr. Meyer's 3/4/03 Report)

3

13. According to Dr. Meyer's report of Ms. Gillespie's March, 17 2003 visit, the CT Scan revealed that she suffered from a "non-united non-comminuted fracture." (PX 7; Dr. Meyer's 3/17/03 Report) One month later, Dr. Meyer reported, that Ms. Gillespie "will have a long term disability regarding this delay of non-union of the fractured clavicle." (PX 7; Dr. Meyer's 4/21/03 Report).

14. Dr. Salter testified that the concomitant delayed healing, and Ms. Gillespie's long-term disability, resulted in a "shortening" of the clavicle, which causes a "mechanic derangement" to the shoulder. (12/10/07; 152:17-21) Dr. Salter testified, "It would be like...a bow string, and the bow has to be under tension for it to work correctly. And if you shorten the bow or break the bow, when you try to pull the arrow with a laxed string, it's not going to work. And this is the same thing here. It's not going to work as well." (12/10/07; 152:22-25, 153:1)[2]

15. In his trial testimony, Dr. Salter cited recent studies from two well respected academic journals in the field of orthopedic surgery to support his contention that Ms. Gillespie suffers from a debilitating deformity. The studies, published in "The Journal of Bone and Joint Surgery" and "The Journal of the American Academy of Orthopedic Surgeons" in 2006 and 2007, respectively, concluded that many patients who experienced continuing pain from clavicle fractures suffered from shortened clavicles. (12/10/07; 135:6-16).

16. Dr. Salter testified that the reason for the continuing pain in these patients was that "muscles have to be at their correct length." He explained, "Muscles can only shorten a certain amount. And if the bone is already shortened and the muscles are coming off the

---

[2] See 140:20-25, 141:1-14 for Dr. Salter's explanation of clavicular shortening.

bone, then the muscle is pre-shortened before it attempts to contract. And that amount that it is shortened takes away from its ability to shorten even more to do what it is supposed to do, which is to raise the arm or raise the arm forcefully." (12/10/07; 135:22-25, 136:1-5)

17. Dr. Salter confirmed that in his experience, patients who suffer from a shortened clavicle are very unhappy with their condition and struggle with any type of overhead activity. (12/10/07; 136:1-13)

18. Compounding this condition, Ms. Gillespie also suffers from arthritis and diabetes, both of which have intensified the pain she experiences from the shortening of her right clavicle. According to Dr. Salter, diabetes predisposes a person "for [a] condition called *adhesive capsulitis*, which is a stiffening of the shoulder. So they tend to get that more so than individuals that don't have diabetes. But even putting that aside, her MRI shows that she has degenerative arthritis of her shoulder joint. And prior to [the accident] she was moving her shoulder normally. But due to the fact that she had to immobilize it for a long period of time to get this fracture to heal and she has the arthritis of the shoulder, any arthritic joint, the worse thing that one can do for an arthritic joint is not move it." (12/10/07; 136:20-25, 137:1-6)

19. Dr. Salter testified that Ms. Gillespie's condition had worsened somewhat between her visits on December, 19, 2006 and her most recent visit of November 9, 2007. In Dr.

Salter's opinion, Ms. Gillespie's increased pain over that time period was likely caused by the degenerative arthritis in her shoulder. (12/10/07; 145:13-23, 146:3-4)[3]

20. Given the nature of her injury, Dr. Salter testified that Ms. Gillespie would never be able to function as she had prior to the accident, and that she has "a permanent deformity and permanent shortening of the muscles." (12/10/07; 146:3-4) He opined that the right clavicle has shortened approximately one inch. (12/13/07; 62:1-3)[4]

21. Dr. Meyer's reports further buttress Dr. Salter's testimony that Ms. Gillespie suffers from a significant permanent deformity. In his April 21, 2003 report, Dr. Meyer wrote, "[Ms. Gillespie] continues not fit for working duty. She will have a long term disability regarding this delay of non-union of the fractured clavicle." (PX 7; Dr. Meyer's 4/21/03 Report) Even when Dr. Meyer discharged Ms. Gillespie from his care on April 12, 2004, he cautioned, "She does have permanent injury to the shoulder, but may return to work," (PX 7; Dr. Meyer's 4/12/04 Report)

---

[3] Defendant disputed Ms. Gillespie's worsening symptoms on the grounds that she aggravated her condition in a 2004 auto accident, in which she sustained injuries to her back, neck, and leg. In Dr. Salter's opinion, however, Ms. Gillespie's 2004 auto accident had no effect on the permanent shoulder deformity which was caused by the delayed healing of her fractured clavicle; the injuries from the 2004 accident, as the records reflect, do not appear to have any significant relationship to the injuries at issue in this case. (Defendant's Exhibit 6, 12/10/07; 159:23)

[4] Defendant disputed the extent of the shortening of Ms. Gillespie's clavicle and its significance. Dr. Conant argued that the clavicle was only shortened by a little less than a quarter of an inch and was therefore not a major deformity. Dr. Conant's measurement, however, only accounted for the two-dimensional length of the shortening. In his rebuttal testimony, Dr. Salter persuasively demonstrated a more logical means of measuring clavicular shortening and accounting for the three-dimensional nature of the measurement. As further discussed below, regardless of the specific size of the deformity, the preponderance of the evidence supports the conclusion that Ms. Gillespie continues to suffer from significant symptoms of the clavicle deformity. The continued existence of symptoms supports the conclusion that the clavicular fracture is a significant injury, that it never healed properly, and that it is painful and debilitating. (12/13/07; 41:22-23, 62:1-3)

22. The report of defense expert, Dr. Richard Conant, failed to reference the opinions of Dr. Meyer or Dr. Salter that Ms. Gillespie suffered from a permanent deformity to her shoulder. (Defendant's Exhibit 3)[5]

23. Ms. Gillespie's fractured clavicle and the injuries associated with its delayed healing and resulting deformity were proximately caused by the accident of August 2, 2002 involving defendant's employee. (12/10/07; 151:21)

24. The following is a chart that details the medical costs that Ms. Gillespie has incurred thus far as a result of the August 2, 2002 accident:

| | |
|---|---|
| D.C. Fire & EMS | $ 207.00 |
| Washington Hospital Center | $ 656.52 |
| EMC Emergency Physicians | $ 226.00 |
| Phillips & Green, M.D. | $ 11,811.50 |
| Holy Cross Hosp. | $ 323.44 |
| Diagnostic Medical Imaging | $ 348.00 |
| Robert J. Brumback, M.D. | $ 579.00 |
| Accessible MRI of Mont. County | $ 1,000.00 |
| Bioelectron, Inc. | $ 4,470.00 |
| Health South Diagnostic Center | $ 631.00 |

---

[5] Even at the time of his trial testimony, Dr. Conant was unaware that the Plaintiff was right-handed and did not know if that had any significance to her ability to work at her previous job. (12/13/07; 21:19) Along the same lines, Dr. Richard Brumback, a physician with whom Ms. Gillespie consulted, released her for work without restrictions without inquiring about the physical demands of her job. (12/10/07; 64:11-13) Dr. Salter, addressing Dr. Brumback's release of Ms. Gillespie from his treatment, testified, "Well,... hindsight is 20/20, but he felt, at least at that time, she could go back to full work. She tried and couldn't go back. And her deformity and pain is all consistent with what we know of these injuries." (12/10/07; 148:9-15)

| Total Medical Expenses to Date | $ 19,487.86 |
|---|---|

### C.  MS. GILLESPIE'S LOST WAGES

25. Born and raised in Commerce, Georgia, Ms. Gillespie attended school until the age of 15, at which time she began working in order to support her family. (12/10/07; 4:1-9)  Before moving to the Washington, DC area at the age of seventeen, she had held jobs as a fast-food cook and a housekeeper at a motel. (12/10/07; 4:11-25, 5:1-17)

26. Having raised six sons and two stepsons by herself, Ms. Gillespie was extremely active prior to the accident.  In addition to her employment, which is set out further below, she regularly hosted family dinners for her extended family, typically having fifteen to twenty people in attendance.  At these family gatherings, plaintiff did the cooking and sometimes played football with her grandchildren. (12/10/07; 114:19-20)

27. At the time of the accident, Ms. Gillespie was employed by the porter and maintenance staff of Realty Management, LLC. (12/10/07; 4:20-23)  She was responsible for cleaning and preparing apartments that were to be rented out in the near future, with job duties that consisted of stripping, waxing, and buffing floors, helping lay carpet, hanging dry wall, laying tile, and helping install toilets, sinks, and cabinets. (12/10/07; 10:6-9, 53:25, 54:1-16)

28. As reflected by her pay stub, at the time of the accident Ms. Gillespie earned $11.40/hr for her regular hours and time and a half for overtime hours. (12/11/07; 18:8-13)

29. Beyond material benefits, Ms. Gillespie enjoyed her job with Realty Management and considered it to be her "hobby."  Ms. Gillespie testified, "I loved doing that work.  I

wanted that work. I really wanted that work to be my goal and my hobby because I grew up doing that work from the South, hard work. I love hard work." (12/10/07; 13:18-20) When asked to explain how she felt that her job was also her hobby, Ms. Gillespie responded, "That's what I loved doing. I wish that I could still do that again." (12/10/07; 14:21-22)

30. Due to her injuries, Ms. Gillespie's doctors explicitly advised her to restrict her workload to part-time, light duty. Under these restrictions, she could no longer satisfy the requirements of her job at Realty Management. (12/10/07; 21:19)

31. Toward the end of 2004, after Ms. Gillespie was authorized to return to work only in a part-time, light duty capacity, she took a part-time job stocking items on shelves at the local Family Dollar store. This job is consistent with the restrictions imposed by her doctors, as the items she stocks are small and lightweight. (12/10/07; 18:20-25, 19:7-13, 22:6-8)

32. The medical restrictions imposed by her doctors at that time also limited her to working no more than five to six hours a day. (12/10/07; 22:6-8) Her earnings at her job at the Family Dollar store, which started off at a rate of $6.50/hr were consistently below that of her previous salary. (12/10/07; 24:14)

33. Although Ms. Gillespie was self-sufficient prior to the accident, she has needed to rely on financial help from her sons since her 2002 injuries. As she testified, "Then before the accident, I was basically carrying everything, all my bills, my rent, everything by myself. But now I have to – my sons and them have to help me with my bills, my medicine and everything." (12/10/07; 25:16-19)

9

34. On account of economic pressures, caused by her reduced income, plaintiff failed to heed the advise of her treating doctors, and since 2005 has worked on a full time basis at Family Dollar. In order to cope with the discomfort caused by the longer work schedule, Ms. Gillespie continues to receive generous accommodations from her employer and takes breaks from her job every fifteen to twenty minutes. Plaintiff also ingests pain relievers with regular frequency to get through the day. (12/10/07; 23:15-22)

35. In order to assess Ms. Gillespie's employability and earning potential, in light of her abilities and her physical restrictions, she was interviewed by Phillip Bussey, Ph.D. A vocational rehabilitation specialist and a certified rehabilitation counselor, Dr. Bussey is a member of several professional organizations in his field, and the author of fourteen articles in his area of expertise. (12/11/07; 7:17-25, 9:7-25).

36. Dr. Bussey evaluated the employability of Ms. Gillespie based on her age, education, training, job skills, and the competition she would have faced in the job market. (12/11/07; 14:19-22) He also relied on medical records to evaluate what work activity was safe for Ms. Gillespie. (12/11/07; 15:20-25, 16:1-16) In order to facilitate Dr Bussey's vocational analysis he propounded a number of written questions to Dr. Meyer as to what physical activities Ms. Gillespie could perform, the number of hours she could safely work and related questions. (PX 12; August 4, 2006 Report: 3)[6]

37. In Dr. Bussey's expert opinion, Ms. Gillespie's wage rate would have increased from $11.40/hr at the time of the 2002 accident to between $14-16/hr by 2006 had she

---

[6] Dr. Salter testified at trial that he was in agreement with the conclusions set out in Dr. Meyer's report to Dr. Bussey regarding Ms. Gillespie's work restrictions. (12/10/07; 144:2-24) Dr. Salter affirmed that "they would be permanent restrictions." (12/10/07; 144:21)

remained employed on the porter and maintenance staff at Realty Management, as he credits this wage increase to the rising demand for experienced maintenance workers in the Washington Metropolitan Area. (PX 12; 8/4/06:5)

38. Responding to the assertion that Ms. Gillespie's possibly not completing high school would result in significantly lower salaries, Dr. Bussey testified that, "It really didn't matter a great deal whether or not she was a high school graduate or not because she had actually worked over the years offering basically a willingness to work and the strength and the use of her body to earn her living." (12/11/07; 17:7-11, 103:25)

39. Furthermore, Dr. Bussey characterized Ms. Gillespie's job on the Porter and Maintenance Staff of Realty Management as more comparable to "light construction" work than "cleaning." He testified, "The work she did before [the August 2, 2002 accident] was comparable, if you will, to light construction work and the lifting went up to 50 pounds, the workdays were long, and they involved overtime. The pressure to get the job done promptly so that the apartment could be rented out again was always there." (12/11/07; 28:7-12)[7]

40. Dr. Bussey concluded that Ms. Gillespie's ability to work in any capacity is remarkable, in light of her age and her injuries. (12/11/07; 25:14-23) He further reported, "For those of Ms. Gillespie's background who have a work disability, or a limitation in the kind or amount of work they can do because of a health problem, which is her status, only 8.8% are employed full time and 7.9% work part time, with 80.3% identified as not in the labor

---

[7] Mr. Thomas Walsh, who was offered as defendant's economic expert, testified that he considered Ms. Gillespie's work to be in the category of "cleaner." (12/12/07; 47:6-7)

11

force. No data was available on the remaining 3%. In view that the data is of good statistical quality there is no reason to believe it would not apply to Ms. Gillespie's situation, which makes it quite unusual for her to be working at all as most persons with her limitations do not work. Certainly very few such persons are employed regardless of their level of education." (PX 12; 8/4/06 Report: 4).[8]

41. Based on his understanding that Ms. Gillespie was then working light duty on a part time basis at Family Dollar, Dr. Bussey argued that "the job that she had was the best that we could expect for her and she got a lot of accommodation there." (12/11/07; 25: 24-25, 26:1) He concluded that "the rate of pay that she gets is a reasonable estimate of what is her current earnings capacity." (12/11/07; 26:5-6)[9]

### D.   ECONOMIC CALCULATIONS

42. Economist, Richard Edelman, Ph.D, testified for Ms. Gillespie as an expert, regarding her lost wages resulting from the injuries sustained in the August 2, 2002 accident. Dr. Edelman holds a Bachelor of Science Degree awarded with high honors in 1968 from the University of Maryland, College Park. He then earned his MBA from the University of

---

[8] Ms. Kathleen Sampeck, Defendant's expert vocational rehabilitation witness, questioned Ms. Gillespie's not pursuing job retraining on the grounds that she could increase her future salary if she was willing to do so. Yet, Dr. Bussey testified earlier that job retraining would not be worthwhile for Ms. Gillespie because "it is not a shortage of skills that limits what she can do, but rather it is a diminished ability to be more physically active than the equivalent of part time work, so further training does not offer to her any great potential for increasing her income." (Plaintiffs Exhibit 12; Dr. Bussey's 8/06 Report: 5-6)

[9] Additionally, a decision of the Social Security Administration further supports the conclusion that Ms. Gillespie's injuries preclude her return to her prior employment. That agency found that Ms. Gillespie suffered a permanent injury on August 2, 2002 and she was awarded disability benefits. (PX 14, 12/11/07; 23:3-25, 24:5-7)

Maryland, College Park in 1970 as well as a Ph.D. in Business Administration from the same university in 1975. Dr. Edelman's specific field of expertise is Financial Economics. Throughout 35 years in academia, Dr. Edelman has taught undergraduate and graduate courses in this field, in addition to publishing roughly 65 articles in peer-reviewed academic journals. (12/11/07; 71:6-23)

43. Dr. Edelman estimated Ms. Gillespie's future losses based on the income reflected in her W-2 forms and pay stubs from 1999-2007, as well as government estimates of life expectancy, work life expectancy, projections of future inflation, and wage quotes. Dr. Edelman also based Ms. Gillespie's life expectancy and work-life expectancy on U.S. Department of Health and Human Services statistics. (PX 13; 12/10/07 Report: 3) Relying on these statistics, and Ms. Gillespie's age and employment status, she would have been expected to work an additional twelve years had the accident not occurred. (12/11/07; 81:10-25, 82:1-3)

44. As Dr. Bussey reported earlier, Ms. Gillespie was projected to earn between $14-$16/hr by 2007 if she had remained employed on the Porter and Maintenance Staff at Realty Management. Dr. Edelman therefore calculated Ms. Gillespie's future wage loss using the conservative estimate of $15/hr as her wage rate for 2007. (PX 13; 8/2006 Report: 5)

45. Dr. Edelman calculated Ms. Gillespie's lost future wages under two different scenarios. As a result of her injury, Dr. Edelman determined that Ms. Gillespie lost a total of $276,266.00 in wages, reduced to present value, that she would have earned had she been able to work on the Porter and Maintenance Staff through the end of her working years.[10]

---

[10] All of Dr. Edelman's other calculations are reduced to present value as well.

46a. Even if Ms. Gillespie were to continue to work *full-time* for the remainder of her working life, Dr. Edelman calculated that she would require $157,154.00 to replace her lost wages because her income from the Family Dollar would mitigate the $119,111.00 difference. (PX 13; 12/10/07 Report: 4)

46b. If Ms. Gillespie were to work *part-time* for the rest of her work life- as her doctors have advised her to do- Ms. Gillespie would require $200,740.00 to replace future wage loss because her reduced part-time income would only mitigate $75,526.00 of her loss. (PX 13; 12/10/07 Report: 4)[11]

47. A projection of Ms. Gillespie's future wage loss based on part-time employment is the best representation of Ms. Gillespie's true wage loss in that she has only worked full-time against her physicians' advice. That Ms. Gillespie's financial situation motivates her to feel that she must presently work, against medical advice, should not prevent her from being fully compensated for her injuries. While plaintiff has an obligation to mitigate her damages, she should not be required to do so at the risk of her health and well being. That she must take several breaks an hour and ingest pain medication on a regular basis, underscores the wisdom of her doctors' restrictions and the imprudence of her continuing to work full-time. (12/10/07; 23:15-22)

48. Although Mr. Walsh, defendant's economic expert, contended that Dr. Edelman overstated Ms. Gillespie's future wage loss on the grounds that her projected income was inflated, this dispute is not within the realm of an economist's expertise. Dr. Edelman

---

[11] Mr. Walsh testified that Dr. Edelman inflated the future wage loss by using an inaccurate discount rate. Mr. Walsh, however, conceded that the discount rate discrepancy with Dr. Edelman was a minor issue and minimally affected the bottom line. (12/12/03; 46:20-21)

referred Mr. Walsh to Dr. Bussey's expert vocational opinion regarding Ms. Gillespie's projected wage growth: "Mr. Walsh has objections to the blue collar wage growth rate as an uninjured employee versus a lower wage growth rate as a part-time employee at Family Dollar. Part-time employees experience lower growth rates than full time employees and Ms. Gillespie has the additional handicap of an injury. To assume her post-injury wages would grow at the same rate as her no injury wages is reaching. Given that Dr. Bussey indicates she may be doing more than she is capable of doing, lower post-injury wage growth rate best reflects the reality of her situation. In fact, the loss I showed understates the eventual loss if she is unable to continue working." (PX 13; Dr. Edelman's 2/21/07 Report: 1)

49. At the time of the accident, Ms. Gillespie was a 46 year-old woman projected, by Department of Health and Human Services statistics, to have a life expectancy to age 79. As the testimony and reports of her treating physicians have demonstrated, for approximately the past five years she has suffered from a deformity to the clavicle that has significantly affected her life. This deformity, on her dominant side, inhibits the use of her right upper extremity and requires her to regularly take pain relievers. The discomfort, suffering and inconvenience caused by her fractured clavicle and resulting shoulder deformity are expected to continue throughout the remainder of her life (12/10/07; 152:1-7). Thus, for the next approximately 28 years, Ms. Gillespie will most probably continue to experience the pain, suffering and inconvenience of the injuries caused by the accident of August 2, 2002.

50. Based on the foregoing, plaintiff, Delois Gillespie, is entitled to recover her medical expenses and lost wages, as well as damages for pain, suffering, and inconvenience in the following amounts:

| | |
|---|---|
| Medical Specials | $19,487.86 |
| Lost Wages | $200,740.00 |
| Pain, Suffering, and Inconvenience | $_____ |

### E.   PLAINTIFF DUGAR'S INJURIES AND DAMAGES

51. As a result of the accident, Ms. Debbie Dugar was thrown forward, hitting her knee against the inside of a bus seat and landing on her back. Ms. Dugar testified, "My whole knee had swollen up." She continued, "It was my right knee. And my back had a little knot, I guess from [the] bruise of rocking back, hitting the pole." (12/10/07; 71:4-7)

52. Immediately following the accident, Ms. Dugar was taken to Washington Hospital Center by ambulance and treated for the injuries to her knee. (PX 6; Washington Hospital Center, 12/10/07; 69:21-25, 70:1-12)

53. Ms. Dugar was referred to Dr. James Weiss, an orthopedic specialist, and attended physical therapy sessions intermittently through late 2004. At a physical therapy session in November 2004, she complained of throbbing pain in her knee and sharp back pain. (PX 6; 11/22/04 Report from Matrix Rehabilitation, Sun Spectrum Outpatient Rehab)

54. The following is a chart that details the medical costs that Ms. Dugar has incurred thus far as a result of the August 2, 2002 accident:

| | | |
|---|---|---|
| D.C. Fire & EMS | $ | 207.00 |
| James M. Weiss, MD | $ | 411.00 |
| EMC Emergency Physicians | $ | 181.00 |
| Washington Hospital Center | $ | 749.00 |
| Julie Altshuler, PT | $ | 426.00 |
| Barbara G. Douglas, MD | $ | 108.00 |
| **Total Medical Expenses to Date** | $ | **2,082.00** |

55. Prior to the August 2, 2002 accident, Ms. Dugar was employed by the Maintenance Staff at the Ronald Reagan Building in Washington, DC. As a janitor, Ms. Dugar was responsible for maintaining 42 of the building's bathrooms. She also mopped and buffed floors and was responsible for trash removal. (12/10/07; 70:19-22)

56. According to the maintenance company that employed Ms. Dugar, she lost $3,174.00 in wages due to the injuries she sustained in the accident. (PX 6, Employee's Loss of Earnings Statement)

57. Mr. Lester Craft, the man with whom she had been in a relationship for approximately nine years at the time of the accident, testified that she became much less active after she sustained her injuries from the August 2, 2002 accident. According to Mr. Craft, the two of them would go jogging prior to the accident, and played other sports together, but that her performing these activities came to an end after the accident. (12/10/07; 74:9-15, 76:16, 95:13-16)

58. Based on the foregoing, plaintiff, Debbie Dugar, is entitled to recover her medical expenses and lost wages, as well as damages for pain, suffering, and inconvenience in the following amounts:

| | |
|---|---|
| Medical Specials | $2,082.00 |
| Lost Wages | $2,174.00 |
| Pain, Suffering, and Inconvenience | $_____ |

## II. CONLUSIONS OF LAW

1. Under the Federal Tort Claims Act, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances ..." 28 U.S.C. § 2674.

2. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1346(b), 2671–2680

3. The causes of action arise from the sole negligence of Mr. Johnny Stinson, an employee of the United States of America, who was acting within the scope of his employment at the time.

4. Plaintiff Delois Gillespie is entitled to judgment in the amount of $_____ against the United States of America.

5. Plaintiff Debbie Dugar is entitled to judgment in the amount of $_____ against the United States of America.

Respectfully submitted,

/s/ Kenneth M. Trombly
Kenneth M. Trombly # 199547
Schultz & Trombly
1050 17th St, N.W., Suite 1250
Washington, DC 20036
(202) 887-5000

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was efiled and mailed first class, postage prepaid on February 22, 2008 to:

Wyneva Johnson, Esq.
Jonathan Brumer, Esq.
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7224

Attorneys for Defendant

/s/ Kenneth M. Trombly

Cc:

Kenneth M. Trombly
1050 17th Street, NW, Suite 1250
Washington, DC 20036

Wyneva Johnson
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001