**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
DEBBIE DUGAR, <u>et al.</u>                        )
                                                    )
            Plaintiffs,                             )
                                                    )
            v.                                      )        Civil Action No: 05-1500 (HHK)
                                                    )
UNITED STATES OF AMERICA,[1]                        )
                                                    )
            Defendants.                             )
_____)

**<u>DEFENDANT UNITED STATES OF AMERICA'S  PROPOSED</u>**
**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

        Defendant, United States of America, by its attorneys, submits its Proposed Findings of

Fact and Conclusions of Law in this case brought under the Federal Tort Claims Act, 28 U.S.C.

§§ 2671 <u>et seq</u>, in which plaintiffs Debbie Dugar and Delois Gillespie were injured in an August

2, 2002 motor vehicle accident involving a Washington Metropolitan Area Transit bus and

Johnny Stinson, a member of the United States Secret Service.  Defendant United States has

admitted negligence.

        The issues before the Court are the nature and the extent of plaintiffs' injuries and the

recovery of damages including lost wages. Defendant presented the testimony of three expert

witnesses, Dr. Richard Conant, Orthopedic Surgeon, Mr. Thomas Walsh, Economist and Ms.

Kathleen Sampeck, Vocational Rehabilitation Expert.  Dr. Richard Conant concluded that as a

result of the Metro bus incident of August 2, 2002, Ms. Gillespie sustained a fracture of her right

clavicle that healed with no resultant permanent impairment of function.  He also concluded that

_____

        [1]  In view of defendant United States' admission of liability, the Washington Metropolitan
Area Transit Authority is no longer a defendant in this case.

any mild associated soft tissue involvement of Ms. Gillespie's neck and upper back, resolved with no objective evidence of permanent impairment of function. He further concluded that, by March 8, 2004, if not sooner, Ms. Gillespie was capable of performing full occupational duties with no restrictions.

Dr. Conant concluded that no causal relationship had been established between the August 2, 2002 motor vehicle accident incident and the medical necessity for Ms. Gillespie's resumption of medical care on March 7, 2005, following a gap in medical attention of eleven months. In his opinion, Ms. Gillespie's expanding constellation of subjective complaints were not only disproportionate to objective electrodiagnostic and MRI findings, but the current independent medical examination which he performed suggested symptom magnification.

Dr. Conant also concluded that to the extent that plaintiff Dugar sustained any injuries to her neck and left knee, they were, at most, of an extremely mild soft tissue in nature, based on the physical findings recorded in the Emergency Department on August 2, 2002, and Ms. Dugar's orthopedic consultation with James M. Weiss, M.D. on August 9, 2002.

Dr. Conant further concluded that Ms. Dugar's failure to attend any physical therapy sessions between August 26, 2002 and November 22, 2004, were inconsistent with any significant musculoskeletal injuries. Indeed, not only were full ranges of motion of Ms. Dugar's cervical and lumbar spines identified at the time she resumed therapy on November 22, 2004, but that following her third treatment session on December 1, 2004, Ms. Dugar was released from care with no functional deficits. It was his opinion that Ms. Dugar reached maximum medical benefit from active therapeutic intervention by August 9, 2002, and that she recovered with no

permanent impairment of function or any need for future treatment regarding the August 2, 2002

motor vehicle accident.

Mr. Walsh concluded that the true value of Ms. Gillespie's loss of wages was $42,371

with no taxes taken out, and $38,134 with taxes taken out.

Ms. Sampeck concluded, that Ms. Gillespie was capable of performing certain unskilled

jobs, even with any restriction.

### Testimony of Dr. Richard Conant on Plaintiff Delois Gillespie's Injuries

1.      Dr. Richard H. Conant is an orthopedic surgeon.  He is board certified in

orthopedic surgery by the American Board of Orthopedic Surgeons. He is in his 38th year of

private practice.  Tr. 12/12/07; 117: 16, Tr. 12/12/07; 118:6-7, Tr. 12/12/07; 119:17-18.[1]

2.      Dr. Conant performed an independent medical examination of plaintiff Gillespie.

Prior to the examination, he was provided Ms. Gillespie's medical records.  Tr. 12/12/07; 122: 6-

7, 25.

3.      Dr. Conant testified that Ms. Gillespie was treated with physical therapy for a

neck strain and a back strain, soft tissue injuries, between August 6, 2002 until September 24,

2002.  He opined that beyond that date, Ms. Gillespie had already reached maximum medical

improvement as far as those injuries were concerned, and that she did not require any more

treatment for those soft tissue injuries as of the time she finished her physical therapy on

September 24, 2002.  Tr. 12/12/07; 125: 18-25.

4.      Ms. Gillespie returned to see Dr. Salter on October 1, 2002.  Dr. Salter found a

full range of motion of her neck.  Dr. Conant testified that such a full range of motion indicated

---

[1]References to the official transcript (TR) are to day, page and line.

that Ms. Gillespie had complete mobility. There was no evidence of any spasm of the muscles. There was no tenderness when Dr. Salter palpated these muscles. There was no discomfort when she moved her neck in all directions. Dr. Conant testified that Dr. Salter reported on the neurological function of Ms. Gillespie's upper and lower extremities, and there was no indication there that she had any weakness, any sensory changes or any reflex problems. Ms. Gillespie also stated on October 1, 2002 that her neck and back pain had improved. Tr. 12/12/07; 126: 1-6.

5.    Dr. Salter saw Ms. Gillespie on October 18, 2002, and he made no mention of the neck at all at that date. There was minimal lumbar tenderness at that time. Tr. 12/12/07; 126: 12-14.

6.    Ms. Gillespie saw Dr. Salter on January 3, 2003. He mentioned a full range of motion of her neck. Tr. 12/12/07; 126: 12-13.

7.    Ms. Gillespie was referred her to a fracture specialist, Dr. Robert Brumback, on March 17, 2003. Tr. 12/12/07; 137: 17-19.

8.    Ms. Gillespie's consultation eventually took place with Dr. Brumback on October 30, 2003. Dr. Conant testified that Dr. Brumback interpreted Ms. Gillespie's x-rays as revealing overall acceptable alignment of this fracture and possible healing. He ordered a new CAT scan, a computerized tomogram to more specifically evaluate the status of that healing. Tr. 12/12/07; 138: 2-7.

9.    On November 17, 2003, Dr. Meyer indicated that "We are very thankful that Dr. Brumback, who is a preeminent fracture surgeon, has seen this patient." Tr. 12/12/07; 138: 8-10. The CT study requested by Dr. Brumback showed that Ms. Gillespie's fracture was indeed showing signs of healing. Specifically, it was bridged by callous, the formation of new bone. Tr.

4

12/12/07; 125: 12-16.

10.    Dr. Conant testified that on December 30, 2003, Dr. Brumback recommended physical therapy for one month followed by a home exercise program.  And on that date, he anticipated clearance to return her to any and all activities, including work, after her next visit one month later.  Tr. 12/12/07; 138: 18-2.

11.    Ms. Gillespie saw Dr. Meyer on March 8, 2004.  Dr. Meyer's examination revealed  only minimal tenderness at this fracture site.  He found very little restriction of motion, any weakness in that area was slight.  There was never any documented concern regarding the positioning of this clavicle.  Tr. 12/12/07; 138: 23-25, Tr. 12/12/07 139: 1-5.

12.    Dr. Conant testified that on March 30, 2004, Dr. Brumback stated that Ms. Gillespie had normal shoulder motion and concluded that Ms. Gillespie had an excellent result and that she was able to return to full duty with no restrictions.  Tr. 12/12/07, 139: 6-9.

13.    On April 12, 2004, Dr. Meyer submitted a final progress note.  He again said that there was only slight tenderness of the clavicle site, the fracture site.  Dr. Meyer indicated there was ten percent restriction of motion, which conflicted with Dr. Brumback's assessment.  There was no weakness, there was no instability, and there were no neurological problems.  Dr. Meyer discharged Ms. Gillespie from care at that time with the authorization to return to work.  He closed the chart and advised Ms. Gillespie to discontinue all medications that had been prescribed by anyone in his office.  Tr. 12/12/07, 139: 12-21.

14.    Ms. Gillespie saw Dr. Albert at Allied Health Care on August 2, 2004.  Defendant's Exhibit 6.  Ms. Gillespie indicated that there was pain in her neck on both sides,

which radiated into her right shoulder, arm and hand. It occurred between one half and three fourths of the time when she was awake, and it caused serious diminution in her capacity to carry out daily activities. Id.

15.     Ms. Gillespie returned to Dr. Meyer on March 7, 2005, approximately 11 months following her discharge from Dr. Meyer. Ms. Gillespie denied that she had any new injuries. Tr. 12/12/07, 141: 19- 23.

16.     Dr. Meyer interpreted the x-rays of the right clavicle at that time as revealing a well-healed fracture and an intact shoulder joint. Dr. Meyer prescribed Motrin and a continuation of her home exercise program. Tr. 12/12/07; 141: 25, Tr. 12/12/07; 142: 1-3.

17.     The treatment of Ms. Gillespie's injuries on March 7, 2005 differed from before. Dr. Conant testified that the treatment on that date was "a new concern, new types of injury, new types of complaints, a new way of treating her that had never been used before. They were dealing primarily with an impingement syndrome, which is painful motion of the shoulder relating to inflammation of the rotator cuff. There was no indication that particular entity was of any concern at all prior to this return visit months following her discharge from care with no symptoms of that kind." Tr. 12/12/07, 142: 12-12.

18.     On April 25, 2005, Dr. Meyer reported Ms. Gillespie's subjective complaints of worsening pain about the chest wall region and the right axilla, the armpit area. He expressed concern regarding the possibility of a brachial plexus, a neurological condition that sometimes can be associated with a fractured clavicle. Dr. Meyer ordered electrodiagnostic  studies, a very sophisticated nerve test to measure the electrical activity of nerves that go from that area into the arm. At that time on April 25, 2005, Ms. Gillespie had full range of motion of her neck and all

6

the major joints of the upper extremities, including the shoulder.  Tr. 12/12/07, 142: 23-25, Tr. 12/12/07, 143: 2-11.

19.    On May 2, 2005, Dr. Mansoor conducted nerve studies and he interpreted these studies as being totally normal.  There was no sophisticated elective diagnostic evidence of neurological impairment.  Dr. Mansoor's physical examination showed full range of motion of the neck and of the major joints of the upper extremities.  Tr. 12/12/07, 143: 12-17.

20.    On May 9, 2005, Dr. Meyer  recommended an MRI study to study Ms. Gillespie's complaints in her shoulder.  He authorized her to work five hours per day with some restrictions. Tr. 12/12/07, 147: 18-21.

21.    The MRI of the right shoulder was performed on May 12, 2005.  Tr. 12/12/07, 143: 21-22..  Dr. Conant testified that the MRI findings were suggestive of thickening of the rotator cuff tendons associated with tendonopathy, a degenerative change.  There was no full thickness tear of this tendon, there was no rupture of this rotator cuff, but there was a partial thickness under surface tear that is often associated with this type of physiological degeneration, a physiological aging of the shoulder that takes years to develop.  Tr. 12/12/07, 144: 2-10.

22.    On May 23, 2005, Dr. Meyer recommended further consultation with Dr. Salter regarding the right shoulder.  Dr. Salter saw Ms. Gillespie on June 7, 2005.  At that time, the pain indicated by Ms. Gillespie was not in the shoulder itself, but it was in the upper trapezius and the clavicular regions.  Dr. Salter recorded Ms. Gillespie's range of motion of the shoulder to be full. There was no restriction of shoulder motion and no weakness or instability.  He also found no significant subacromial or rotator cuff tendinitis.  Tr. 12/12/07, 145: 1-10.

23.    Dr. Salter concluded that no specific intervention was indicated after interpreting

7

another x-ray of the right clavicle as revealing satisfactory healing.  Tr. 12/12/07, 145: 12-14.

24.     On June 28, 2005, Dr. Meyer submitted another final progress note, discharging Ms. Gillespie from care, with limitations of right shoulder motion that he considered to be permanent.  Dr. Conant testified that Dr. Meyer continued to record findings of restricted shoulder motion that had not been confirmed either by Dr. Salter or Dr. Brumback, the fracture specialists.  Thus, his findings of restricted shoulder motion contradicted those who had examined the same area contemporaneously.  Tr. 12/12/07, 145: 17-25.

25.     Dr. Conant testified that he was unable to identify any objective basis for Ms. Gillespie's reactions to his physical examination.   There was no swelling, there was no bruising, there was nothing to suggest a reflex sympathetic dystrophy with legitimately marked sensitivity. Dr Conant testified that he examined Ms. Gillespie's strength,  her sensation and her reflexes, and they were totally normal.  Tr. 12/12/07, 148: 11-19.

27.     Dr. Conant testified that his opinion was supported by Dr. Brumback's observations recorded on March 30, 2004, that Ms. Gillespie's range of motion was normal, that she had obtained an excellent clinical result, that her neurovascular status was intact, and that the clavicle fracture was unquestionably united, and that she was capable of returning to full duty with no restrictions.  Moreover, on April 12, 2004, Dr. Meyer had submitted a final progress note referencing her discharge from routine care with the authorization to return to work.   Tr. 12/12/07, 151: 20-25, Tr. 12/12/07; 152: 1-3.

28.     Dr. Conant testified that his opinion was well supported by Dr. Mansoor's May 2nd report because Dr. Mansoor also reported full range of motion of Ms. Gillespie's neck and of all the major joints of her upper extremities and normal electrodiagnostic findings.  Thus,  Dr.

Conant testified that there was no objective substantiation of Ms. Gillespie's expanding constellation of subjective complaints.  Tr. 12/12/07; 152: 7-13.

29.     Dr. Conant testified that his opinion was also consistent with Dr. Salter's June 7, 2005 finding.  Dr. Salter recorded Ms. Gillespie's range of motion of the shoulder to be full, no weakness or  instability, and no significant subacromial or rotator cuff tendinitis, that is, no abnormal physical findings associated with the MRI findings.  Dr. Salter also interpreted another x-ray of the clavicle as revealing satisfactory healing, and concluded that no specific intervention was indicated.  Tr. 12/12/07; 152: 16-24.

30.     Dr. Conant testified that there is no objective reason for Ms. Gillespie's clavicle to be painful at this time.  There was no basis for her to have pain in her shoulder when she was released from care.  Dr. Meyer told her to discontinue all medications that had been provided by his office.  Thus,  in the context of the time frame of being treated for this particular accident, Ms. Gillespie was released from care with no medication and with excellent function of her shoulder girdle.  Tr. 12/13/07; 30: 3-10.

31.     Dr. Conant testified that in someone whose injuries have healed, he would not expect a recurrence.   He testified that if the person returns with a new expanding constellation of subjective complaints, he would look for other causes for the complaints.  12/13/07; 31: 5-10.

32.     Dr. Conant testified that the MRI of the shoulder shows there were some physiological degenerative changes, unrelated to this accident or the clavicular fracture.  Tr. 12/13/07; 31: 13-20.

33.     Dr. Conant testified that there were degenerative changes in Ms. Gillespie's glenohumeral joint.  Tr. 12/13/07; 32: 14-15.  The x-rays never showed anatomical alteration of

9

her joint. Dr. Conant could not characterize a clinical condition of arthritis. He concluded that the MRI finding of degeneration was a finding that most people will experience after each decade of life. Tr. 12/13/07; 33: 2-6.

34.     Dr. Conant testified that the shortening was less than a quarter of an inch. Tr. 12/13/07; 41: 18-21. The overall alignment is fine and Dr. Salter and others had said the alignment is fine. There was some displacement and the overall alignment is satisfactory. Tr. 12/13/07; 43: 2-9.

35.     Dr. Conant testified that there was no indication of shortening in the medical records. The shortening was never an issue while Ms. Gillespie was being treated, and did not play any role in Ms. Gillespie's medical treatment. Tr. 12/13/07; 43: 17-23.

36.     Dr. Richard Conant concluded that as a result of the Metro bus incident of August 2, 2002, Ms. Gillespie sustained a fracture of her right clavicle that healed with no resultant permanent impairment of function. He also concluded that any mild associated soft tissue involvement of Ms. Gillespie's neck and upper back resolved with no objective evidence of permanent impairment of function. He further concluded that, by March 8, 2004, if not sooner, Ms. Gillespie was capable of performing full occupational duties with no restrictions. Defendant's Exhibit 3, 7.

37.     Dr. Conant concluded that no causal relationship had been established between the August 2, 2002 motor vehicle accident incident and the medical necessity for Ms. Gillespie's resumption of medical care on March 7, 2005, following a gap in medical attention of eleven months. In his opinion, Ms. Gillespie's expanding constellation of subjective complaints were not only disproportionate to objective electrodiagnostic and MRI findings, but the current

independent medical examination which he performed suggested symptom magnification. Defendant Exhibit 3, 7.

### Plaintiff Debbie Dugar

38.    Plaintiff Debbie Dugar's medical records indicated that she visited the Department of Emergency Medicine at the Washington Hospital Center on August 2, 2002.  A radiology report indicated that Ms. Dugar had a normal knee exam on August 2, 2002.  There were no recorded complaints of back pain.[2]

39.    On August 7, 2002, Ms. Dugar, then forty years of age, returned to the Department of Emergency Medicine for evaluation of right knee pain.  She was noted to be walking without a cane, and to exhibit knee findings of no effusion, no ecchymosis, a good range of motion, and no external abnormalities. Based on a diagnosis of "knee pain," the examining physician prescribed Tylenol No. 3, Motrin, and additional conservative measures.  Defendant's Exhibit 4,1.

40.    On August 9, 2002, Ms. Dugar saw James M. Weiss, M.D. for an orthopedic consultation.  A physical examination of Ms. Dugar's neck revealed a full range of motion of flexion and extension, 60 degrees of left rotation, and 40 degrees of right rotation.  There was tenderness in the paraspinal, trapezial, and cervicothoracic junctional areas.  Examination of the left knee revealed no signs of bruising or ecchymosis, full flexion and extension, tenderness in the area of the patellar tendon and the patellar insertion, an "unremarkable" ligament exam, slight medial and lateral joint line tenderness, and no effusion.  There were no neurological deficits.

---

[2]  Plaintiff presented no testimony by a physician as to Ms. Dugar's medical condition. Her medical records are admitted as Defendant's Exhibit 4.

Dr. Weiss interpreted x-rays of the cervical spine to be unremarkable, and referenced the results of the knee x-ray study, that had been obtained in the hospital, as being negative. Based on his assessment of "anterior compartment contusion to her left knee, without any obvious ligamentous injury, and a cervical spine strain,"  Dr. Weiss provided Ms. Dugar with a knee immobilizer, and recommended a course of physical therapy directed to her cervical spine. Defendant's Exhibit 4, 1-2.

41.    Following an interval of one month since her initial visit with Dr. Weiss, Ms. Dugar returned for a re-evaluation on September 10, 2002. Examination of her knee revealed no effusion, medial and lateral joint line tenderness around the patellar tendon, a full range of motion, and a negative grind test. Examination of the cervical spine revealed full flexion, extension and rotation, and tenderness in the left trapezial and posterior aspects in the high thoracic spinal region. There was no reference to any muscle spasm. Dr. Weiss recommended a continuation of physical therapy. Defendant's Exhibit 4, 2.

42.    Ms. Dugar had failed to attend any physical therapy since August 26, 2002, according to a physical therapy report dated October 24, 2002. Ms. Dugar resumed therapy on November 22, 2004. Ranges of motion of the cervical and lumbosacral spines were reported to be within normal limits. After receiving ice/hot packs and electrical stimulation on that date, and attending an additional session on November 23, 2004, Ms. Dugar informed her therapist, on December 1, 2004, that she was able to "do whatever" with no functional deficits. After characterizing her pain as being "non-descript and unable to quantify," her therapist  advised her to  continue with  her home exercise program for two weeks, and to return on an as needed basis. Defendant's Exhibit 4, 2-3.

12

43.     Dr. Conant concluded that based on the physical findings recorded in the Emergency Department on August 7, 2002, the August 9, 2002 orthopedic consultation with James M. Weiss, to the extent that Ms. Dugar sustained any injuries to her neck and left knee, they were, at most, of an extremely mild soft tissue in nature. Defendant's Exhibit 4, 3.

44.     He further concluded that Ms. Dugar's failure to attend any physical therapy sessions between August 26, 2002 and November 22, 2004, were also inconsistent with any significant musculoskeletal-skeletal injuries.  Not only were full ranges of motion of her cervical and lumbar spines identified at the time she resumed therapy on November 22, 2004, but that following her third treatment session on December 1, 2004, she was released from care with no functional deficits.  He opined that Ms. Dugar reached maximum medical benefit from active therapeutic intervention by August 9, 2002, and that she recovered with no permanent impairment of function or any need for future treatment regarding this reported incident. Defendant's Exhibit 4, 3.

### Mr. Thomas Walsh

### Defendant's Calculation of the Present Value of Ms. Gillespie's Lost Wages

45.     Thomas Walsh,  defendant's expert witness in the field of economics, testified regarding  the precise calculation of the wages Ms. Gillespie lost as a result of the injuries she sustained in the August 2, 2002 bus accident. Tr. 12/11/07; 8-12.   He holds an undergraduate degree in Economics which was awarded to him with honors, Phi Beta Kappa, in 1969, from Georgetown University in Washington, D.C.  In 1973, he graduated from Harvard Business School with a Master's in Business Administration, with a concentration in finance. Tr. 12/11/07; 125:17-25; Tr. 12/11/07; 126:1-9; Tr. 12/11/07; 126:22-24; Tr. 12/11/07; 127:1-4.  Mr.

13

Walsh has performed a similar type of economic analysis to the one he performed in this case concerning the value of lost earnings on numerous occasions – by his estimate, 400-500 times – before doing so in connection with this case.  Tr. 12/11/07; 128:15-24.  He has been qualified as an expert witness 60-70 times in Courts around the country in 16 or 18 States. Tr. 12/11/07; 128:21-25; Tr. 12/11/07; 129:1-3.

46.     Mr. Walsh was asked  to determine the present value of Ms. Gillespie's loss of earnings based on data he was given. Mr. Walsh prepared a report summarizing his findings, which was dated October 24, 2006.  Defendant's Exhibit (DX 1) DX 1.9.  Mr. Walsh's report concluded that the true value of Ms. Gillespie's loss was $42,371 with no taxes taken out, and $38,134 with taxes taken out.  DX 1; Tr. 12/12/07; 4:7-14. The analysis which Mr. Walsh performed in his report and the assumptions upon which it were based were submitted to a reasonable degree of economic certainty. Tr. 12/12/07; 5:9-12.

47.     Mr . Walsh testified that:

(1) The first step in calculating the present value of a loss is to determine the anticipated future earnings of the individual assuming there had been no injury at all. Tr. 12/11/07; 131:7-20; Tr. 12/11/07; 132:4-6; DX 1.

(2) This no injury (pre-injury) anticipated future earnings number is then reduced by any net taxes that would be paid. Mr. Walsh explained that in a case like this the net taxes would reflect a consideration of the net difference between the pre- and post-injury earnings. Tr. 12/11/07; 131:20-21; Tr. 12/11/07; 132:8-11; DX 1.

(3) The resulting number is then increased by the value of any net lost fringe benefits. Tr. 12/11/07; 131:21-22; Tr. 12/11/07; 132:11-14; DX 1. For example, Mr. Walsh explained that

14

if someone was getting a 401(k) plan before and doesn't anymore, that would be

an example of a net lost fringe benefit.  Id.

(4) Finally, the resulting number is reduced by the value of anticipated post-injury future

earnings (i.e., post injury earnings capacity or potential). Tr. 12/11/07; 131:22-24;

Tr. 12/11/07; 132:14-16; DX 1.

48.    Mr. Walsh explained that the above operations yield a number which is known as

an "annual loss." That annual loss is then discounted to present value over the work life

expectancy of the individual. Tr. 12/11/07; 131:24-25; Tr. 12/11/07; 132:16-19; DX 1. Mr.

Walsh testified that this is the formula which is appropriate for computing the present value of a

future earnings loss. Tr. 12/11/07; 132:22-25; Tr. 12/11/07; 133:1-3; Tr. 12/11/07; 133:5-13.

49.    Mr. Walsh explained that the above formula is used for determining the present

value of a future earnings loss, but that "there's no discounting to present value for past loss," as

"it is what it is," the "absolute loss," simply "whatever the actual loss was." Tr. 12/11/07;

133:1-3; Tr. 12/11/07; 143:25; Tr. 12/11/07; 144:1; Tr. 12/12/07; 8:7-24; Tr. 12/12/07; 9:1-3.

Mr. Walsh indicated that it is inappropriate to adjust a past loss to present value. He explained

that whereas one discounts a future loss because one has the ability to invest the funds to make

payments into the future, one may not do so with respect to a past loss. Tr. 12/11/07; 143:20-25.

Thus, a flaw in Plaintiff's Economics expert, Dr. Richard Edelman's analysis, is that he adjusted

past losses to present value.  Tr. 12/12/07; 7:13-25; Tr. 12/12/07; 8:1-25; Tr. 12/12/07; 9:1-13;

Tr. 12/12/07; 10:1-24.

50.    Mr. Walsh testified, and his report indicates, that two dates were critical to his

analysis in this case: the date of the bus incident (August 2, 2002) and the date on which he

15

assumed that Ms. Gillespie was able to return to work without restriction (March 8, 2004). Tr. 12/11/07; 136:19-25; Tr. 12/11/07; 137:1; Tr. 12/12/07; 4:19-22; DX 1. Mr. Walsh explained that he based his conclusion that Ms. Gillespie that was ready to return to work on March 8, 2004 on Dr. Conant's independent examination and report. Those documents indicated that Dr. Conant as well as other doctors had determined that, as of that date, Ms. Gillespie was capable of returning to work with no restrictions. Tr. 12/11/07; 137:2-10; DX 1; Tr. 12/12/07; 4:23-25; Tr. 12/12/07; 5:1-3.

51.    Mr. Walsh began his analysis in this case by determining the level of Ms. Gillespie's pre-injury anticipated earnings. Tr. 12/11/07; 133:18-24. He made this determination based in part on a consideration of the position Ms. Gillespie had at Realty Management Corporation and her earnings level at Realty Management Corporation at the time of the bus incident in August 2002. Tr. 12/11/07; 133:18-24. Specifically, Mr. Walsh noted that the pay stub immediately prior to the date of injury indicated that Ms. Gillespie was earning $11.40 an hour at Realty Management at the time of her injury in 2002. Based on this piece of empirical data, Mr. Walsh assumed that had Ms. Gillespie not been injured in 2002, she would have earned $11.40 an hour for the remainder of calendar year 2002. Tr. 12/11/07; 137:11-25; Tr.12/12/07; 4:15-17; Tr. 12/12/07; 5:4-8.

52.    In the absence of any specific data concerning rates of wage increases at Realty Management Company, Mr. Walsh assumed that had Ms. Gillespie not been injured in 2002, her hourly wage would increased in subsequent years at an annual rate of 3.53%, the historic rate of increase in wages for blue collar occupations in the United States for the period from 1998-2006, according to the Bureau of Labor Statistics. Tr. 12/11/07; 138:16-23; Tr. 12/11/07;

16

139:12-15; Tr. 12/11/07; 141:1-13 (explaining the significance of the 3.53% rate); Tr.

12/12/07; 4:17-18. Mr. Walsh explained that this was an appropriate percentage in view of the

job qualification and profile that Ms. Gillespie had, including the fact that she had what he

described as "basically a cleaner [position]" which he explained was a blue-collar position which

on average was likely to increase at a rate consistent with blue-collar positions overall. Tr.

12/11/07; 139:19-24; Tr. 12/11/07; 147:3-9 (Mr. Walsh's testimony that he understood that at

Realty Management, Ms. Gillespie was "a part of a cleanup crew that . . . went in cleaned up . . .

apartments or apartment buildings when they were turning over.") Mr. Walsh's understanding of

the nature of Ms. Gillespie's duties at Realty Management is consistent with Ms. Gillespie's own

testimony.[3]

53.    In calculating Ms. Gillespie's anticipated post injury earnings, Mr. Walsh took

into consideration that Ms. Gillespie had no earnings from the date of the injury through March

8, 2004. He assumed, however, that Ms. Gillespie could earn post injury wages for the

period from March 8, 2004 (the date she could return to work with no restrictions) to the end of

her work life expectancy, in the amount equal to whatever she would have earned at Realty

Management (or an equivalent position) in the future. Tr. 12/11/07; 140:3-23; see also Tr.

12/11/07; 134:16-21. Mr. Walsh assumed that in the wake of her injury, Ms. Gillespie's earning

potential or capacity will increase by a rate of 3.53%, the historic rate of increase in wages for a

blue collar occupations in the United States for the period from 1998-2006, according to the

Bureau of Labor Statistics. Tr. 12/11/07; 140:24-25; Tr. 12/11/07; 141:1-13; Tr. 12/12/07;

_____

[3] Tr. 10 12/10/07; 12:3-8; Tr. 12/10/07; 70:17-22; Tr. 12/10/07; 53:21-23; Tr.
12/10/07;54:1-25; Tr. 12/10/07;55:1-6.

17

4:17-18.

54.    In calculating Ms. Gillespie's net taxes, Mr. Walsh assumed that she would pay approximately 10 percent of her gross income in taxes.  He based this assumption on the fact that Ms. Gillespie was filing as a single taxpayer, that the annualized value of her hourly wage of $11.40 was roughly $20,000, and the fact that data prepared by various government sources indicates that, in general, single taxpayers with this income will pay approximately 10% of their gross income in income taxes. Tr. 12/11/07; 141:14-20; Tr. 12/11/07; 142:1-17. Mr. Walsh assumed that Ms. Gillespie's net taxes paid were $0 because taxes on Ms. Gillespie's pre-injury income and the taxes applicable to her post-injury income would "cancel out" inasmuch as she is "earning the same income afterwards as she's earning before, so there's zero taxation differential." Tr. 12/11/07; 142:18-21.  Mr. Walsh also testified that he deemed Ms. Gillespie's payroll taxes "to be an offset." Tr. 12/11/07; 141:21-25.

55.    Mr. Walsh assumed that Ms. Gillespie had no fringe benefits.  Tr. 12/11/07; 143:1-5.  At trial, he explained that "[t]here was no indication of any fringe benefits from the prior position and none from the subsequent position that she had" and that in any event "the anticipation is that she could return to work with -- without any restrictions, so could return to her prior position" so that her fringe benefits would remain unchanged.  Tr. 12/11/07; 143:1-5.

56.    Mr. Walsh explained that the present value of Ms. Gillespie's earnings loss for the period from August 2, 2002 (the date of the bus incident) to March 30, 2004 (the date on which he assumed Ms. Gillespie was ready to return to work without restrictions) was simply "the actual hard loss"- the total of her losses for the 17-month period that she was out of the work

18

force.  Tr. 12/11/07; 143:6-13.  He indicated that this loss was equal to approximately

$42,000.  Tr. 12/11/07; 143:10-11.  Mr. Walsh explained that this loss is a past loss and that

it is inappropriate to add interest to this amount.  Tr. 12/11/07; 143:14-19.[4]

57.     Mr. Walsh determined that Ms. Gillespie's future earnings loss is $0, based upon

his assumption that she was ready to return to work without restrictions on March 30, 2004.  Tr.

12/11/07; 144:1-5.

58.     Mr. Walsh explained that using the proper economic processes as he outlined, the

approximate reduction in the present values determined by Dr. Edelman in his second December

2007 report would be 6% for the net discount rate in a short period of time (and 25-30% over a

40 year period), 12% for the exaggerated base wage ($15 per hour) and using the appropriate

earnings rate based on her current position, earnings and time worked is 30%, for a more than

48% total reduction on Dr. Edelman's numbers. Tr. 12/12/2007; 19:3-25; Tr. 12/12/2007;

20:1-9.

### The Flaws in the Economic Analysis Conducted by Plaintiff's Economist, Dr. Richard Edelman

59.     Plaintiff's economic expert, Dr. Richard Edelman, testified that "[b]asically [his]

valuation rests on Dr. Bussey's vocational report." Tr. 12/11/07; 80:25; Tr. 12/11/07; 81:1. Dr.

Edelman testified that in preparing his August 2006 report, he based his assumptions concerning

the "stream of income that [Ms.] Gillespie would have earned, uninjured and injured, on Dr.

---

[4] As mentioned, Mr. Walsh testified that it is inappropriate to discount a past loss to present value. He explained that one discounts a future loss because one has the ability to invest the funds to make payments into the future, whereas one may not do so with respect to a past loss.  Tr. 12/11/07; 143:20-25; Tr. 12/11/07; 144:1; Tr. 12/11/07; 133:1-3.

Bussey's vocational report, his August 2006 vocational report." Tr. 12/11/07; 83:19-22.

60.     Specifically, Dr. Edelman testified that, in preparing his August 2006 report for Mr. Trombly, he relied upon Mr. Bussey's assumption that had Ms. Gillespie not been injured and remained on her old job at Realty, she would have earned between $14 and $16 per hour in 2006, and that he took the average of $14 and $16, which is $15. Tr. 12/11/07; 84:4-6; Tr. 12/11/07; 98:14-19; Tr. 12/11/06;105:7-8.

61.     Dr. Edelman's assumption that Ms. Gillespie would have made between $14 and $16 an hour in 2006 had she not been injured is inconsistent with data published by the United States Department of Labor's Bureau of Labor Statistics concerning national and local mean and median hourly wages in various fields.  Tr. 12/11/07; 145: 2-22; Tr. 12/11/07; 147:10-25; Tr. 12/11/07; 148:1-20.  No data point published by the Bureau of Labor Statistics or any other source supports the $14 to $16 figure that Mr. Bussey and Dr. Edelman adopted. Tr. 12/11/07; 148:21-24.  Dr. Edelman's assumption that Ms. Gillespie would have earned $15 an hour had she not been injured in 2006 results in an hourly salary that is greater than 50% higher than the U.S. Census data suggests if the 2004 mean data is used (and much greater than that if the 2006 data for a female with less than a high school education is considered). Tr. 12/11/07; 153:1-3.

62.     In order for Ms. Gillespie's wage to have increased (had she not been injured in 2002) from $11.40 in 2002 to $15 in 2006 would have required approximately a 7.1% increase over the four-year period, and about a 7.9% increase in the first year.  Tr. 12/11/07; 100:3-5; Tr. 12/11/07; 149:2-18; Tr. 12/11/07; 150:1-5.  By contrast, income for all blue collar workers rose by only 3.53% during the 1980-2006 period, a rate which Dr Edelman acknowledged was

20

"slower" than Mr. Bussey assumed.  Tr. 12/11/07; 101:10-14; Tr. 12/11/07; 150:7-23.  However,

Dr. Edelman assumed that Ms. Gillespie's hourly wage would have increased (had she not been

injured in 2002) from $11.40 in 2002 to $15 in 2006 (the midpoint of the $14 and $16 Mr.

Bussey had assumed) in his analysis because "this is Dr. Bussey's opinion, and that's what [he,

Dr. Edelman] valued."  Tr. 12/11/07; 101:10-14.  The difference between the 7.1% rate of

increase over the 2002-2006 period which Dr. Edelman assumed and the historical rate of wage

increase among blue collar workers is a "statistically significant" 100% difference.  Tr. 12/11/07;

150:24-25; Tr. 12/11/07; 151:1-4.

63.     Dr. Edelman admitted in his testimony that it was "[a]bsolutely" true that "[i]n

preparing [his] report, [he] took Mr. Bussey's -- [he] accepted his view that Miss Gillespie would

have earned actual wage increases that are more than twice the actual wage increase that

blue-collar workers have experienced over the past quarter century."  Tr. 12/11/07; 101:15-

21; Tr. 12/11/07; 145:12-22.

64.     Dr. Edelman acknowledged in his testimony that the earnings cycle is a well

established fact in economics, and it suggests that earnings for high school educated workers

basically flatten out from the age of 45 on.  Tr. 12/11/07; 101:22-25; Tr. 12/11/07;102:1-3.

Despite his knowledge of this principle, Dr. Edelman admitted that he "took Dr. Bussey's word

for it" that Ms. Gillespie's wages would have increased by "90 cents per hour" each year "in the

no-injury scenario."  Tr. 12/11/07; 102: 3-8.

65.     Dr. Edelman testified, at the time of the 2002 bus incident, Ms. Gillespie did

cleaning work, and he noted the same thing in the first report he prepared for Mr. Trombly.  Tr.

12/11/07; 102: 9-16; Plaintiff's Exhibit 13 at 4 (noting that "Ms. Gillespie was employed by

Realty Management Associates as an apartment cleaner.") For her part, Ms. Gillespie testified that, before the 2002 bus accident, her work at Realty consisted of cleaning, mopping and buffing floors. At trial, Ms. Gillespie also testified that when she was working at Realty in 2002, she did not repair machines, she was not doing technical work, and she did not do installation work on her own, but rather merely held objects up while others did the installation work. Tr. 12/10/07; 54:1-25; Tr. 12/10/07; 55:1-6.

66.    When Dr. Edelman adopted Mr. Bussey's conclusion that Ms. Gillespie's wage would have grown to between $14 and $16 by 2006 had she not been injured, he did so without considering the fact that the Bureau of Labor Statistics has reported that in May 2006 the mean hourly wage in the United States for janitors and cleaners, except maids and housekeeping cleaners, was only $9.58. Tr. 12/11/07; 103:21-25; Tr. 12/11/07; 104:1. Instead, he just "relied on Dr. Bussey's wage track." Tr. 12/11/07; 104:1-2. Nor is there any evidence that Dr. Edelman considered any of the other mean and median wage data which the National Bureau of Labor Statistics and U.S. Census have published.

67.    Mr. Walsh testified that Dr. Edelman understated the rate of increase in Ms. Gillespie's post-injury wages in his first report (dated August 10, 2006). Tr. 12/11/07; 153:14-20; Tr. 12/12/07; 21-25. In his first report, Dr. Edelman assumed that Ms. Gillespie's wage at Realty would have increased at an annual rate about 50% higher than the rate he assumed that it would grow post-injury at Family Dollar. Tr. 12/11/07; 156:4-10. Dr. Edelman used an improper amount for alternate income because his December 2007 report does not use the same process as he used in his 2006 report, and is based on faulty assumptions about Ms. Gillespie's annualized income at Family Dollar. Tr. 12/12/2007; 11:10-22.

68.    Another flaw with Dr. Edelman's analysis is that he adjusted past losses to present value.  It is inappropriate to adjust a past loss to present value.  Tr. 12/11/07; 133:1- 3; Tr. 12/11/07; 143:20-25; Tr. 12/11/07; 144:1; Tr. 12/12/07; 7:13-25; Tr. 12/12/07; 8:1-25; Tr. 12/12/07; 9:1-13; Tr. 12/12/07; 10:1-24.  The process used by Dr. Edelman, whereby he took past losses and "increased" them by an assumed interest or inflation rate was improper, was a form of pre-judgment interest, and is not a valid economic calculation.  Tr. 12/12/2007; 7:25; Tr. 12/12/07; 8:1-24.  Mr. Walsh also testified that Dr. Edelman utilized an inappropriate discount rate in his second December 2007 report in calculating Ms. Gillespie's future losses, which significantly inflated his calculation of her future losses: by 25-30% over a period of 40 years. Tr.12/12/07; 17:4-25; Tr. 12/12/07; 18:1-25; Tr. 12/12/07; 19:1-13. Mr. Walsh testified that the proper discount rate for determining the present value of future losses, if any, was 2% to 3% as opposed to the nearly 0 (zero) rate used by Dr. Edelman in his second report.   Tr. 12/12/2007; 17:4-25; Tr. 12/12/07; 18:1-25.

## Mr. Bussey's Flawed Assumptions

69.    Mr. Bussey admitted at trial that his August 4, 2006 report only discusses in detail the finding of one doctor, Dr. Meyer.  Tr. 12/11/07; 34:1-5; Plaintiff's Exhibit 12 (PX 12)(Mr. Bussey's report) at 3-4.  He acknowledged that his August 4, 2006 report does not mention of any of Dr. Brumback's findings. Tr. 12/11/07; 34:6-8; Tr. 12/11/07; 34:21-2; Tr. 12/11/07; 35:13-14;  Plaintiff's Exhibit 12 (Mr. Bussey's report).  Mr. Bussey also admitted at trial that his August 4, 2006 report does not mention the findings of Dr. Salter.  Tr. 12/11/07; 35:16-18; Plaintiff's Exhibit 12 (Mr. Bussey's report).

70.    In the orthopedic report by Greater Chesapeake Orthopedic Associates, dated

March 430, 2004, Dr. Brumback indicated that Ms. Gillespie's range of shoulder motion was normal, that she had obtained an excellent clinical result, and that her neurovascular status was intact. Tr. 12/11/07; 36:6-25; Tr. 12/11/07; 37:1-19. In the orthopedic report by Greater Chesapeake Orthopedic Associates, dated March 30, 2004, Dr. Brumback also concluded that Ms. Gillespie had obtained an excellent result and that she was capable of returning full duty with no restrictions, and he released her for work on that date. Tr. 12/11/07; 38:3-20.

71.     On April 12, 2004, Dr. Meyer submitted a final progress note in which he referenced Ms. Gillespie's discharge from routine care with the authorization to return to work. Tr. 12/11/07; 38:22-25; see also Tr. 12/11/07; 39:11-12. In his final progress note dated April 12, 2004, Dr. Meyer also stated that Ms. Gillespie's neurological and vascular status was intact, and found that she could return to work. Tr. 12/11/07; 39:13-17.

72.     On July 28, 2004, Ms. Gillespie was involved in a second motor vehicle accident, and she visited Allied Health Care on August 2, 2004, complaining of symptoms in connection with that accident. Tr. 12/11/07; 39:25; Tr. 12/11/07; 40:1-7. A report prepared by Allied Health Care practitioners, dated August 2, 2004, indicates that during and after the second accident, Ms. Gillespie noted that her right side, back, neck, and right leg hurt very badly. Tr. 12/11/07; 40:16-21. The Allied Health Care practitioners' report further indicates that, following Ms. Gillespie's second accident, her most dominant symptom was aching pain on the neck bilaterally, and that she reported that it radiated into her right shoulder, arm, and hand. Tr. 12/11/07; 540:22-25; Tr. 12/11/07; 41:1-3.

73.     Mr. Bussey has admitted that he did not have a copy of the August 2, 2004 report by Allied Health Care practitioners at the time that he prepared his report for Plaintiff's counsel

(Mr. Trombly). Mr. Bussey has acknowledged that he did not contemplate the Allied Health Care practitioners' report when he prepared his report for Mr. Trombly.  Tr. 12/11/07; 40:10-12; Tr. 12/11/07; 41:4-7.

74.    Mr. Bussey was aware of the existence of at least one report which indicated that there had been a gap of 11 months between Ms. Gillespie's April 12, 2004 visit to Dr. Meyer, and her resumption of medical care on March 7, 2005, when she suddenly started reporting symptoms after having been deemed to be in great shape in earlier medical evaluations.  However, Mr. Bussey failed to independently verify whether such a gap in fact existed, or to consider its significance. Tr. 12/11/07; 41:9-18.

75.    Mr. Bussey's August 4, 2006 report assumed that Ms. Gillespie's hourly pay was at the $12-13 an hour level at the time that she worked for Realty in 2002.  See Tr. 12/11/07; 45:1-4; Plaintiff's Exhibit 12 at 5.  Mr. Bussey testified that he based his assumption that Ms. Gillespie was earning $12-$13 an hour at Realty at the time of her 2002 accident in part on the fact that she had represented to him that her pay was $12 an hour plus benefits during an "interview." Tr. 12/11/07; 18:1-3; Tr. 12/11/07; 47:16-20. His report indicates that she reported that her pay was in the $12-$13 range in 2002.  Plaintiff's Exhibit 12 at 5.

76.    Ms. Gillespie testified at trial that, in July 2002, the week before the accident, she was earning only $11.40 an hour.  Tr. 12/10/07; 50:1-14.  Her pay stub dated July 26, 2002 indicated the same thing.  Tr. 12/11/07; 103:12-20.  Ms. Gillespie acknowledged, at trial, that she had never made more than $11.40 per hour in any job in her life thus far. Tr. 12/10/07; 59:19-23.

77.    Mr. Bussey based his estimate of Ms. Gillespie's pre-injury wage in part on the assumption that she would have worked overtime and earned 1.5 times the base rate for

overtime.  Tr. 12/11/07; 18:8-13; Tr. 12/11/08; 45:8-11.  Ms. Gillespie conceded at trial that she

did not work overtime with Realty very often. Tr. 12/10/07; 56:11-15.

78.    Mr. Bussey's August 4, 2006 report assumed that, had she not been injured in

2002, Ms. Gillespie's wage would have grown from $11.40 an hour in 2002 to $14-$16 an hour

in 2006.  Plaintiff's Exhibit 12 at 5; Tr. 12/11/07; 61:15-23; Tr. 12/11/07; 50: 3-13; Tr. 12/11/07;

55:18-25; Tr. 12/11/07; 56:1.

79.    Mr. Bussey's August 4, 2006 report assumed that Ms. Gillespie was a high school

graduate for the purposes of his analysis.  Plaintiff's Exhibit 12 (Mr. Bussey's report) at 1; Tr.

12/11/07, 23 -25.   However, Ms. Gillespie testified at trial that she was educated up to the eighth

grade, the end of Junior High School.  Tr.  12/10/07; 3:25; Tr. 12/10/07; 4:1; Tr. 12/11/07;

51:15-18.

80.    Ms. Gillespie testified that before the 2002 bus accident her work at Realty

consisted of cleaning, mopping, buffing floors.  Tr. 12/10/07; 12:3-8; Tr. 12/10/07; 70:17-22. At

trial, Ms. Gillespie also testified that when she was working at Realty in 2002, she did not repair

machines.  Tr. 12/10/07; 53:21-23.  At trial, Ms. Gillespie also testified that when she was

working at Realty in 2002, she was not doing technical work.  She testified that she did not do

installation work on her own, but rather merely held objects up while others did the installation

work. Tr. 12/10/07;54:1-25; Tr. 12/10/07;55:1-6.

81.    The U.S. Department of Labor, Bureau of Labor Statistics, publishes annual

reports on the mean and median hourly wages in various fields. Tr. 12/11/07; 52:18-23.

Plaintiff's own expert witness, Mr. Bussey, testified at trial that he was familiar with these

reports and considered the data contained within them to be generally reliable and accurate. Tr.

12/11/07; 53:11-19;  Tr. 12/11/07; 58:9-11. Mr. Walsh also testified that he is familiar with these reports. Tr. 12/11/07; 147:10-12.

82.    The U.S. Department of Labor, Bureau of Labor Statistics has reported that in May 2006 the hourly <u>mean</u> wage for "building cleaning workers, all other workers" within the Washington, D.C.-Virginia-Maryland area was only $10.54. Tr. 12/11/07; 55:6-14; Tr. 12/11/07; 148:7-11.

83.    The U.S. Department of Labor, Bureau of Labor Statistics has reported that, in May 2006, the hourly median wage for "building cleaning workers, all other workers" within the Washington, D.C.-Virginia-Maryland area was only $10.17. Tr. 12/11/07; 55:15-17; Tr. 12/11/07; 148:12-14.  No data point published by the Bureau of Labor Statistics or any other source supports the $14 to $16 figure that Mr. Bussey and Dr. Edelman adopted. Tr. 12/11/07; 148:21-24.[5]  By contrast, the U.S. Census has reported that, in 2004, the mean annual income for a female high school graduate was $21,923. Tr. 12/11/07; 58:12-19; Tr. 12/11/07; 152:23-24.[6]

---

[5]Mr. Bussey's report indicates that he based his assumption that Ms. Gillespie's pre-injury earning capacity would have risen to $14 to $16, in part, on the fact that average pay for those employed in "installation, maintenance, and repair" is $20.32 an hour according to the Bureau of Labor Statistics.  Plaintiff's Exhibit 12 at 5.  However, as Mr. Walsh explained, this category of employment does not apply to Ms. Gillespie who worked as an apartment cleaner. Tr. 12/12/07; 26:8-19; Tr. 12/12/07; 27: 22-25; Tr. 12/12/07; 28:1-19.

[6]The U.S. Census has reported that, in 2006, the median annual earnings of a woman with less than a high school degree was $13,255.  "Income, Earnings, and Poverty Data from the 2006 American Community Survey," available at http://www.census.gov/prod/2007/pubs/acs-08.pdf.

**Testimony of Kathleen Sampeck, Defendant's Vocational Expert**

84.     Kathleen Sampeck is a vocational rehabilitation consultant.  As a vocational expert, Ms. Sampeck evaluates people with disabilities.  Ms. Sampeck does vocational assessments and  provide persons with career guidance and counseling, training and job seeking skills, and job placement services.  She holds a bachelor's degree and a master's degree, both in rehabilitation counseling, from the University of Connecticut.  Tr. 12/12/07; 63: 8-16.

85.     She is a nationally certified rehabilitation counselor, nationally certified case manager, nationally certified life care planner, and a certified rehabilitation provider in the State of Virginia.  Tr. 12/12/07; 63: 23-25.  Ms. Sampeck is also a vocational expert for the Social Security Administration.  Tr. 12/12/07; 65: 2-3.

86.     Ms. Sampeck interviewed Ms. Gillespie on September 14, 2006, and reviewed her medical records.  Ms. Sampeck gathered relevant information about Ms. Gillespie's education and employment experience and health status.  Ms. Sampeck performed an analysis of Ms. Gillespie's work or trade profile and established whether or not there were jobs available that were consistent with Ms. Gillespie's work or trade profile, and if so, what those jobs would pay. Tr. 12/12/07, 67: 5-20.

87.     Ms. Sampeck's review of Ms. Gillespie's relevant vocational information revealed that Ms. Gillespie's prior employment consisted of working as a cleaner in a hotel, a fast food worker at McDonald's and Hardy's, a porter, a maintenance worker for Realty Management, and then, subsequent to this accident, a stock clerk for Family Dollar.  Her review revealed that Ms. Gillespie had history of a number of health problems including hypertension, diabetes and sickle cell anemia.  She had gastrointestinal problems, a history of colon cancer, and a history of

pancreatitis.  Ms. Gillespie advised Ms. Sampeck that she had been involved in a subsequent accident in July of 2004 in which she injured her back, her neck, and her upper extremities.  Tr. 12/12/07; 68: 1-13.

88.    Ms. Sampeck testified that she made a determination as to Ms. Gillespie's employment and earning capacity that based on finding by Dr. Brumback and Dr. Meyer that, as of March 2004, the clavicle fracture had healed and that she was able to return to work without restrictions.  Tr. 12/12/07; 68: 20-25.

89.    Ms. Sampeck noted that as of April 2005, Dr. Meyer restricted Ms. Gillespie to sedentary work with certain limitations on lifting, pushing, pulling, overhead reaching, and restricted her eventually to part-time hours.  Yet, Ms. Gillespie did have a period of time, in March of 2004, when she was released for work and went to work full-time. After Ms. Gillespie's involvement in another accident in which there were neck, back and upper extremity injuries, she returned to her doctor the following year, and was placed on part-time hours.  Tr. 12/12/07; 69: 12-22.

90.    Ms. Sampeck testified that there are jobs that would match Ms. Gillespie's work or trade profile of a high school graduate with a history of performing unskilled work, even with physical limitations for sedentary work, such as, no significant lifting, pushing, pulling or overhead reaching.  Tr. 12/12/07; 70: 1-4.

91.    Ms. Sampeck testified that Ms. Gillespie would be capable of performing the work of a cashier, office helper, including making copies, filing, opening and distributing mail. She could also perform light housekeeping, a cleaner position, a counter clerk or a counter attendant.  Tr. 12/12/07; 70: 5-10.

92.    Ms. Sampeck testified that she performed labor market research to establish what those jobs would pay.  She reviewed the Department of Labor, Bureau of Labor Market Statistics and salary databases for her research.  Ms. Sampeck testified that this research revealed that Ms. Gillespie could earn $7 to $10 per hour in those positions on a full-time basis, with the amount prorated for part-time work.  Tr. 12/12/07; 70: 11 - 21.

93.    Ms. Sampeck testified that Ms. Gillespie's prior hourly wage was about $11.50 per hour, which was consistent with the hourly wage of building and maintenance porters in the Washington, D.C. area, and consistent with the  average earnings for female high school graduates  nationally. Tr. 12/12/07, 70: 22-25.   Cashiers in the D.C. area earn between $8.67 and $9.49 per hour.  Maids and house cleaners or housekeepers earn $10.04 to $10.44 per hour. Counter attendants earn $8.65 per hour and office assistants earn $10 to $11 per hour.  Tr. 12/12/07; 74: 20-25.

94.    Ms. Sampeck testified that the finding of disability by the Social Security Administration did not have a significant impact on her opinion regarding Ms. Gillespie's ability to work.  She explained that the finding of disability made by the Social Security Administration is a finding that person meets that agency's criteria for eligibility for that benefit.  There are many benefits  programs, Workers' Compensation, short-term disability, long-term disability, Social Security, and they all have a different definition of disability in order to qualify for those benefits. Tr. 12/12/07; 71: 17-25.

95.    Ms. Sampeck testified that, although an individual may qualify for benefits from a vocational perspective, such eligibility does not indicate that the person cannot work.  She explained that in this context, Social Security disability is given to someone who the agency

determines is not able to work for a period of at least one year.  She testified that the decision in

this case indicated that the case should be reviewed in 18 months, which suggests that the Social

Security Administration recognized that Ms. Gillespie may not have a permanent condition. Tr.

12/12/07, 72: 2-10.

96.     Ms. Sampeck testified that the Social Security Administration has a mechanism

by which recipients of benefits can receive rehabilitation services at no cost in order to return to

the workforce.  Tr. 12/12/07; 72: 11-14.

97.     She further testified that the finding of disability did not affect her opinion

because Ms. Gillespie was working full-time, earning $6.50 per hour for the 8 months directly

preceding the administrative judge's decision regarding a finding of disability Tr. 12/12/07, 73: 2-

5..

98.     Ms. Sampeck also testified that Ms. Gillespie started working full-time in June of

2004.  Ms. Gillespie testified in her deposition that she worked full-time for approximately one

year.  It was not until April or May of 2005, that Dr. Meyer suggested that she only work

part-time.  Tr. 12/12/07; 74: 4-8.

100.    Ms. Sampeck testified that Ms. Gillespie is a very good candidate for vocational

rehabilitation, even though Ms. Gillespie had indicated that she was unable to perform a job

which required overhead reaching.  However, Ms. Sampeck testified that there are a number of

unskilled jobs in the labor market that do not require overhead reaching and significant lifting.

101.    Ms. Sampeck noted that Ms. Gillespie had gone back to work and was working

full-time.  Ms. Sampeck testified that if there's a question that Ms. Gillespie may not be able to

continue doing that same job, Ms. Gillespie could access vocational rehabilitation programs,

which are available to her at no charge, in order to be counseled and to be placed into a suitable job.

CONCLUSIONS OF LAW

1.      This is a case under the Federal Tort Claims Act and plaintiffs may recover damages against the United States of America. Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq.

2.      The party who makes a claim has the burden of proving it.  This burden of proof means that the plaintiffs must prove every element of their claim by preponderance of the evidence.  To establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so.  Standardized Civil Jury Instructions for the District of Columbia, § 2-8 Burden of Proof.

3.      In Director, Office of Workers' Compensation Programs Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 272 (1994), the Supreme court addressed the distinction between the burden of persuasion and the burden of production.  The burden of persuasion also known as the burden of proof is the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose.

4.      The Court finds that the testimony of defendant's experts is more credible than plaintiff's experts.  Thus, plaintiffs have not sustained their burden of proof as to damages.  Thus, plaintiffs would have not sustained their burden on the preponderance of evidence.

5.      The Court finds that Ms. Gillespie has not established by a preponderance of evidence that she is entitled to damages beyond March, 2004.  Accordingly, defendant should be required to pay $42,371 in damages for lost wages to Ms. Gillespie.

6.     The Court finds that Ms. Dugar has not established by a preponderance of evidence that she is entitled to any lost wages.

7.     The Court finds that plaintiffs have not established by a preponderance of the evidence that they are entitled to damages for pain and suffering.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar# 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar# 434122
Assistant United States Attorney


_____/s/_____
WYNEVA JOHNSON, D.C. BAR # 278515
Assistant United States Attorney
555 4th Street, N.W, Room E4106
Washington, D.C. 20530


OF COUNSEL
JONATHAN C. BRUMER