UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBBIE DUGAR and<br>DELOIS GILLESPIE,<br><br>     Plaintiffs,<br><br>     v.<br><br>WASHINGTON METROPOLITAN<br>AREA TRANSIT AUTHORITY, et al.,<br><br>     Defendants. | Civil Action 05-01500 (HHK) |

**MEMORANDUM AND ORDER**

  Plaintiffs, Debbie Dugar and Delois Gillespie, bring this action against the United States and Washington Metropolitan Area Transit Authority ("WMATA") asserting various causes of action arising out of a motor vehicle accident in which both plaintiffs were injured. Both plaintiffs were passengers on a WMATA bus that was struck by a United States Secret Service employee. The United States has admitted negligence, and WMATA has been dismissed as a defendant. The court conducted a bench trial on damages on December 10-13, 2007, to determine the amount of damages. Based upon the evidence presented at that trial, the court makes the following:

**I. FINDINGS OF FACT**

 **A. Delois Gillespie**

1. On August 2, 2002, when the accident occurred, Gillespie was employed full-time by the porter and maintenance staff of Realty Management, L.L.C. She was responsible for cleaning and preparing apartments that were to be rented out in the near future, with job

      duties that consisted of stripping, waxing, and buffing floors, helping lay carpet, hanging dry wall, laying tile, and helping install toilets, sinks, and cabinets. Gillespie earned $11.40 /hour plus time and a half for overtime.

2. As a result of the accident, Gillespie was thrown into a pole adjacent to where she was seated, striking her right clavicle[1] against the pole. Gillespie was taken by ambulance to Washington Hospital Center, where she was diagnosed with a fractured clavicle. To allow the fracture to heal, Gillespie was placed in a sling to immobilize her right shoulder. Due to the fracture, Gillespie was unable to work.[2]

3. After the accident, Gillespie became a patient of Phillips, Green, Salter, and Meyer, which is a private orthopedic practice. From August 2002 to March 2003, Gillespie regularly saw one of two doctors at this practice – Dr. Frederic Salter or Dr. Richard Meyer – for treatment of her fractured clavicle.

4. When a fracture of the type experienced by Gillespie heals uneventfully, it will heal sometime between 6 and 12 weeks. Gillespie's fracture, however, did not heal immediately. She experienced a delayed fracture, which led to ongoing pain. A CAT scan that was taken in March 2003 – approximately seven months after the accident – showed that Gillespie's fracture had not yet healed and that she suffered from a "non-united non-comminuted fracture." Pls.' Ex. 7. Due to the results of the CAT scan, Gillespie was referred to Dr. Robert Brumback, a fracture specialist.

---

[1] The clavicle is the collar bone.

[2] As discussed *infra,* Gillespie was not cleared to return to work until March 2004.

5. By March 2004, the fracture had healed. The fracture, however, resulted in a "shortening" of the clavicle, as well as related shoulder muscles. Dr. Salter testified that this shortening is "like . . . a bow string, and the bow has to be under tension for it to work correctly. And if you shorten the bow or break the bow, when you try to pull the arrow with a laxed string, it's not going to work. And this is the same thing here. It's not going to work as well." Hr'g Tr. 152:22-25; 153:1, Dec. 10, 2007.[3]

6. Compounding Gillespie's difficulties due to the shortening, Gillespie suffers from degenerative arthritis of her shoulder joint. Dr. Salter testified that "the worse [sic] thing that one can do for an arthritic joint is not move it," *Id.* at 137:5-6, yet Gillespie had to immobilize her shoulder for a long period of time to allow the fracture to heal. Aside from the arthritis, when the shoulder is immobilized for an extended period of time, the shoulder stiffens. Furthermore, Gillespie suffers from diabetes. Diabetes predisposes a person for a condition called adhesive capsulitis, which is a stiffening of the shoulder. Dr. Salter testified that Gillespie has developed adhesive capsulitis in her shoulder.

7. Accordingly, the fracture caused long-term disability and permanent injury to her shoulder. She has "permanent limitation of motion of the right shoulder." Pls.' Ex. 7.

8. Because the fracture healed by March 2004, Dr. Brumback and Dr. Meyer cleared Gillespie to return to work. Gillespie was limited, however, in the kinds of jobs she was able to perform, even though the doctors did not specifically restrict the types of jobs

---

[3] The parties dispute the extent of the shortening. Gillespie contends that the shortening was extensive and resulted in an extensive permanent deformity. The United States asserts that the shortening was minimal. Regardless of the specific size of the deformity, the evidence supports the conclusion that Gillespie's physical capabilities are limited due to the fracture.

Gillespie was cleared to perform. The shortening of the clavicle limited Gillespie's ability to raise her right arm and lift heavy objects. Accordingly, she was incapable of performing the demanding physical tasks associated with her previous job as a porter. Furthermore, as a result of the fracture, Gillespie experienced chronic pain.

9. Gillespie had few employment prospects upon her return to work.[4] Not only was Gillespie significantly restricted in the degree to which she could exert herself physically, she also has a limited educational background, having only attended high school.[5] She has had no formal job training since high school, other than that gained through practical experience and on the job training.

10. Accordingly, Gillespie became a stock clerk at a Family Dollar Store. She began working there in November 2004. This job requires less physical exertion than her prior job as a porter. She stands throughout the work day and mostly lifts ten pounds or less at a time. Gillespie's supervisor allows her to take breaks as needed in order to accommodate pain she experiences. Gillespie regularly takes pain relievers at work.

---

[4] At trial, Gillespie and the United States presented competing testimony regarding Gillespie's employability and earning potential in light of her injury. The court credits the testimony provided by the vocational rehabilitation expert retained by Gillespie, Dr. Phillip Bussey, as opposed to the testimony provided by the United States' vocational rehabilitation expert, Kathleen F. Sampeck. The court finds that Sampeck's testimony is flawed because it assumes that, by April 2004, Gillespie was capable of engaging in physical exertion without any restrictions. This assumption is wrong. As discussed *infra*, in 2006 Dr. Meyer placed significant restrictions on the extent to which Gillespie could engage in physical exertion.

[5] It is unclear whether Gillespie actually graduated high school. Gillespie asserts that she graduated when she was 15, which is unlikely.

11. Gillespie's initial wages at Family Dollar were $6.50/hour. Sometime in 2007, Gillespie's wages at Family Dollar increased to $7.21/hour.[6] Her wages are expected to increase in the future at an annual rate of 3.49%, which represents the actual wage growth for retail workers between 1980 and 2007.[7] While this is a historic rate of increase, the court sees no reason why this rate should not be applied to determine future increases in income.

12. These wages are significantly less than what Gillespie earned as a porter. As a porter, she earned $11.40/hour. Had she not been injured, Gillespie's wages as a porter, $11.40/hour, would have been expected to increase annually by 3.53%, which is the actual wage growth for blue collar workers between 1980 and 2006.[8] While this is a historic rate of increase, the court sees no reason why this rate should not be applied to determine future increases in income.

13. In 2005, Gillespie returned to Dr. Meyer, complaining of pain due to the fracture. Due to this pain, Gillespie received a cortisone injection at least once, in April 2006.

---

[6] It appears that plaintiffs did not submit any pay stubs reflecting the $7.21/hour rate. Dr. Robert Edelman, however, testified that Gillespie's pay stub reflects a $7.21/hour rate, and the court credits Dr. Edelman's testimony.

[7] Dr. Edelman, who valued Gillespie's lost earnings, cites 3.49% as the annual rate of increase for retail sales workers between 1980 and 2007. Dr. Edelman, however, asserts that Gillespie's wages at Family Dollar would have increased at 3.77% in the future. It is unclear how Dr. Edelman arrived at the 3.77% figure. Accordingly, the court adopts the historic rate of increase of 3.49% as an approximation of the extent to which Gillespie's wages will increase on an annual basis.

[8] Dr. Bussey testified that, in his opinion, Gillespie would have earned between $14-16/hour at Realty Management by 2006 if she had not been injured. Dr. Bussey provided no basis for this conclusion, and the court rejects it.

14.  By August 2006, Dr. Meyer indicated that there are significant limitations as to the kinds of physical activities that are safe for Gillespie to perform as part of a job. According to Dr. Meyer, Gillespie should avoid stooping or kneeling, crouching/crawling, pushing/pulling with the right arm, and reaching or handling with the right arm, and should be limited to working 30 hours or less per week.[9] Dr. Meyer indicated that he does not expect significant improvements in Gillespie's physical abilities in the future, and that these restrictions are expected to be permanent.[10]

15.  Taking into consideration these limitations, Gillespie is presently working to the full extent possible and may actually be working beyond her capacity. Gillespie's earnings at Family Dollar are a reasonable representation of what she can expect to earn now and in the future.

16.  According to Dr. Richard Edelman's report, pursuant to the U.S. Department of Health and Human Services work-life expectancy tables, Gillespie is expected to work through 2014.

---

[9] Dr. Meyer also stated that Gillespie can sit for 30 minutes at a time before she must get up, sitting for a total of 4-5 hours in a work day; standing is limited to 10 minutes at a time for 1 hour total in a work day; and walking is limited to 100 feet. It is unclear how these restrictions are relevant to the clavicle fracture because there is no indication in the record that Gillespie suffered injury to her lower extremities.

[10] Gillespie was discharged from Dr. Meyer's care in April 2004, but returned in March 2005, complaining of pain. The United States apparently contends that these later complaints stemmed from different injuries, such as injuries that Gillespie suffered in an August 2004 car accident. The court rejects the United States' argument and credits the view that these later complaints of pain stemmed from the fractured clavicle.

**B. Debbie Dugar**

17. At the time of the accident, Dugar was employed by the maintenance staff at the Ronald Reagan Building in Washington, D.C. As a janitor, she was responsible for maintaining forty-two of the buildings' bathrooms. She also mopped and buffed floors and was responsible for trash removal.

18. As a result of the accident, Dugar was thrown forward, hit her knee against the inside of a bus seat, hit a pole, and landed on her back. She was taken to the Washington Hospital Center and treated for injuries to her knee.

19. Dugar then visited Dr. James Weiss, an orthopedic specialist for examination and treatment. Dr. Weiss found that she suffered a neck sprain and a contusion of the knee. As a result of the knee injury, Dugar wore a knee brace. Dr. Weiss also referred Dugar to physical therapy, and Dugar attended physical therapy sessions intermittently. She attended two sessions in August 2002, as well as several sessions in 2004.

20. Dugar missed seven weeks of work due to her injury and was, as a whole, much less active physically after the accident than before. For example, prior to the accident, Dugar went jogging and played sports with Lester Craft, the man with whom she had been in a relationship for approximately nine years at the time of the accident. These activities came to an end after the accident.

## II. CONCLUSIONS OF LAW

21. The United States has admitted liability under the Federal Tort Claims Act ("FTCA").

22. Under the FTCA, the law of the state where the claim arose – that is, where the misconduct occurred – governs the damage award. 28 U.S.C. § 1346(b); *Richards v.*

*United States*, 369 U.S. 1 (1962). The accident in question occurred in the District of Columbia, thus the law of the District of Columbia governs the calculation of damages.

23.  Under the law of the District of Columbia, "the primary purpose of compensatory damages in personal injury cases is to make the plaintiff whole." *District of Columbia v. Barriteau,* 399 A.2d 563, 566 (D.C. 1979) (internal quotation omitted). Accordingly, "[c]ourts must base compensatory damages awards on substantial evidence and not on mere speculation." *Calva-Cerqueira v. United States*, 281 F. Supp. 2d 279, 294 (D.D.C. 2003) (*citing Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988); *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982)). Plaintiffs do not need to "prove damages to a mathematical certainty, [but] the court must have a reasonable basis upon which to estimate the damages." *Id.*

**A.  Lost Earnings**

24.  Plaintiffs request damages for lost earnings. Gillespie seeks recovery of past and future lost earnings,[11] and Dugar seeks recovery of past lost earnings. When determining

---

[11]  As explained in *District of Columbia v. Barriteau*,

> The loss of the future earning capacity represents the amount that the injured party would have earned but for the injury. Therefore, evidence must be presented regarding the demonstrated earning capacity of the injured party prior to the injury and this figure must be projected over the remaining working life of the injured party taking into account expected future earning increases. Secondly, the actual future earning capacity must be ascertained, and this sum is determined by evaluating what the injured party can now be expected to earn in light of diminished physical capacity. Finally, both must be reduced to their present value, using a valid discount rate. The difference between the two present value figures is the present value of the loss of future earnings.

399 A.2d 563, 567 n.6 (D.C. 1979).

whether to award damages for future lost earnings, the court must consider facts specific to the plaintiff at issue, such as age, sex, occupational class, and probable wage increases over the remainder of the plaintiff's working life. *Croley v. Republican Nat'l Comm.*, 759 A.2d 682, 690 (D.C. 2000); *Calva-Cerqueira*, 281 F. Supp. 2d at 298.

25. When calculating lost earnings, past losses are not discounted or somehow brought to present value. Only future losses are discounted to present value.

26. The discount rate must be determined by comparing projected growth rates of wages with current and historic interest rates. The court rejects Dr. Edelman's view that the net discount rate must be determined using only current interest rates.

   **1. Delois Gillespie**

27. Prior to the accident, Gillespie earned $11.40/hour at Realty Management. Had Gillespie not been injured and stayed at this job, her wages would have increased annually at the rate of 3.53%.

28. In light of her physical and educational limitations, Gillespie's earnings at Family Dollar are a reasonable representation of the amount she is capable of earning. When Gillespie first began working at Family Dollar, she earned $6.50/hour. She currently earns $7.21/hour, and her wages are expected to increase annually at 3.49%. 2014 represents the end of Gillespie's work-life expectancy.

29.  For the period from August 2, 2002, to March 30, 2004,[12] in which Gillespie was unable to work, she is entitled to the full amount that Gillespie would have earned after taxes had she worked during this period at $11.40/hour with annual increases of 3.53%.

30.  For the period from March 31, 2004, onwards, in which Gillespie was able to work, Gillespie is entitled to the difference between the wages she would have earned had she worked at Realty Management and her wages at Family Dollar. For the period from March 31, 2004, to the present, this calculation must be performed using Gillespie's actual Family Dollar wages of $6.50/hour and $7.21/hour. For the period extending from the present to the end of Gillespie's work life expectancy, this calculation must be performed using Gillespie's current salary of $7.21/hour increasing annually at 3.49%.

   **2. Debbie Dugar**

31.  Dugar testified that she missed seven weeks of work due to the accident, and that she ordinarily works between thirty-five and forty-hours per week. She is entitled to recover lost earnings for this period. Dugar testified that her hourly rate of pay at the time of the accident was $11/hour, and plaintiffs' proposed findings of fact assert that Dugar is entitled to lost wages of $2,174.00. In so asserting, plaintiffs' proposed findings of fact and conclusions of law cite: (1) plaintiffs' Exhibit 6 and (2) "Employee's Loss of Earnings Statement." Plaintiffs' Exhibit 6 consists solely of Dugar's medical records; it contains no information related to Dugar's earnings. Furthermore, the court is unable to

---

[12] The United States contends that Gillespie could return to work on March 8, 2004, per Dr. Richard Connant's evaluation of Gillespie's injuries. The court instead utilizes the date of March 30, 2004, which is the date on which Dr. Brumback authorized Gillespie to return to work.

locate the "Employees' Loss of Earnings Statement" in the record. Based on Dugar's testimony as to her earnings and amount of work she missed, however, the court concludes that $2,174.00 is a reasonable approximation of the amount of Dugar's lost wages.

### B. Medical Expenses

32. Plaintiffs seek to recover for the medical expenses that they incurred as a result of the accident. Under District of Columbia law, plaintiffs are entitled to recover the expenses for past medical care. *See Anthony v. Allstate Ins. Co.,* 790 A.2d 535, 537-38 (D.C. 2002) (demonstrating that medical expenses are recoverable).

33. Plaintiffs have introduced into evidence receipts setting forth the amount of medical expenses they have incurred. Gillespie incurred $19,487.86 and Dugar incurred $2,082.00 in medical expenses. The United States does not contest these amounts.

### C. Pain and Suffering

34. Plaintiffs seek to recover for the pain, suffering, and inconvenience they endured as a result of the accident. In determining whether to award damages for pain and suffering, the court may consider the amount of pain experienced, how plaintiffs suffered, the extent of the suffering, its nature and intensity, as well as plaintiffs' "internal condition perceptible to [their] senses." *Jones v. Miller*, 290 A.2d 587, 590 n.5 (D.C. 1972) (citation source omitted). The pain and suffering must be "conscious." *Calva-Cerqueria*, 281 F. Supp. 2d at 294.

**1. Delois Gillespie**

35.  The court finds that Gillespie has experienced pain and suffering.  Due to the combination of delayed healing, arthritis, and diabetes, Gillespie has experienced continual pain due to the fracture and regularly takes pain relievers.  As a result of the fracture, Gillespie's ability to perform physical tasks, such as lifting and carrying, has been inhibited.

36.  The court awards Gillespie $90,000 in damages for pain and suffering.

**2. Debbie Dugar**

37.  The court finds that Dugar has demonstrated that she experienced pain and suffering.  The week after the accident, she felt pain in her knee and experienced trouble walking.  She also wore a knee brace for some time.  The amount of pain and suffering was not extensive, however, as her injuries are not permanent.  *Cf. Hawthorne v. Canavan*, 756 A.2d 397, 399 (D.C. 2000) (upholding jury decision not to award damages for pain and suffering when damages were contested, there were no permanent injuries, and there was nothing "apparent" in plaintiff's injuries that required compensation for pain and suffering).

38.  The court awards Dugar $10,000 in damages for pain and suffering.

### III.  ORDER

It is this 16th day of July 2008, hereby

**ORDERED** that the clerk of the court shall schedule a hearing to take place as soon as the business of the court permits for the presentation of evidence regarding the recovery to which

Delois Gillespie is entitled for her lost wages in light of the court's findings of fact and conclusions of law regarding this element of her damages.[13]

                                                              Henry H. Kennedy, Jr.
                                                              United States District Judge

---

[13] Because this court has determined the factors that will guide the calculation from which the amount for Gillespie's lost wages will be derived, the parties may be able to agree on this amount. A stipulation by the parties is preferable to the time and expense that necessarily will be incurred if a hearing is held.